UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| THOMAS E. PEREZ, Secretary of the United States Department of Labor, | ) ) ) | |
| | ) | No. 7:12-cv-08649-VB |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| FIRST BANKERS TRUST SERVICES, INC., et al., | ) ) ) | |
| Defendants. | ) | |

**FIRST BANKERS TRUST SERVICES, INC.'S RESPONSE TO THE
SECRETARY'S STATEMENT OF UNDISPUTED FACTS**

Defendant First Bankers Trust Services, Inc. ("FBTS"), by its attorneys Fox Rothschild LLP, pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, hereby submits the following Response to the Secretary's Statement of Undisputed Facts that was submitted in support of the Secretary's Motion for Partial Summary Judgment.  In accordance with Local Rule 56.1, FBTS has reproduced each entry in the Secretary's Rule 56.1 Statement and set forth its response directly beneath it.

## BACKGROUND

1.      The Rembar Company, Inc. ("Rembar") was a closely-held corporation located in Dobbs Ferry, N.Y. that was engaged in the distribution and manufacturing of precision parts made from refractory metals. FBTS' Answer to the Secretary's Amended Complaint ("Answer") ¶ 4, ECF No. 17.

        **Admitted.**

2. Rembar sponsored the Rembar Company, Inc. Employee Stock Ownership Plan (the "ESOP") which is a pension plan within the meaning of the Employee Retirement Security Act ("ERISA") § 3(2), 29 U.S.C. § 1002(2). Answer ¶ 4.

 **Admitted.**

3. Defendant First Bankers Trust Services, Inc. ("FBTS") is a trust company headquartered in Quincy, Illinois, that was the Trustee of the ESOP (the "ESOP Trustee") and exercised discretionary authority or discretionary control respecting management of the ESOP, exercised authority or control management or disposition of the ESOP's assets, and had discretionary authority or discretionary responsibility in the administration of the ESOP, pursuant to ERISA § 3(21), 29 U.S.C. § 1002(21). Answer ¶ 5.

 **Admitted.**

4. Frank Firor ("Firor") was Rembar's Chief Executive Officer, Chairman of the Board of Directors, President, and until he sold his 81,885 shares to the ESOP, Rembar's majority stockholder. See Answer ¶ 6, ECF No. 17; see also Administrative Deposition of Frank Firor, Ex. A. to Declaration of Matthew Sullivan 1 ("Sullivan Decl."), at 20:18-21, 54:3-6, 119:13-121:6.

 **Admitted.**

5. Firor was a party in interest with respect to the ESOP due to his status as an employee, officer and director of Rembar, and its majority stockholder. ERISA §§ 3(14)(A), (E) & (H). 29 U.S.C. §§ 1002(14)(A), (E) & (H). Answer ¶5; see also Ex. A at 20:18-21, 54:3-6.

 **Admitted.**

6. Firor's sister Virginia Keilty ("Keilty") was an officer and director of Rembar who sold 11,700 shares of Rembar stock to the ESOP and was thus a party in interest with respect to the

ESOP pursuant to ERISA § 3(14)(H). 29 U.S.C. §1002(14)(H). Firor's mother Rosemary Brockett ("Brockett") was a director of Rembar who sold 6,345 shares of Rembar stock to the ESOP and was thus a party in interest with respect to the ESOP pursuant to ERISA §§ 3(14)(F) & (H). 29 U.S.C. §§ 1002(14)(F) & (H). Ex. A at 54:3-6.

**Disputed as the citation to "Ex. A at 54:3-6" does not include any reference to Virginia Keilty or Rosemary Brockett.**

7. On June 17, 2005, the ESOP purchased at a cost of $15.5 million, 100% of the outstanding stock of Rembar (the "Transaction") from Firor, Keilty and Brockett (collectively the "Sellers"). See Ex. DD FBTS's Response #12 to the Secretary's Request to Admit, dated June 27, 2014.

**Admitted.**

## ESTABLISHMENT OF THE ESOP

8. On January 20, 2005, Firor signed a letter agreement engaging Corporate Solutions Group ("CSG"), an investment bank, to evaluate the feasibility of establishing an ESOP to purchase the Sellers stock. Ex. F.

**Admitted except the citation to the record reflects that The Rembar Company, Inc. retained CSG and that Firor did not sign the letter in his individual capacity as is implied in the Secretary's statement.**

9. CSG estimated that the value of 100% of Rembar's common stock was $15,719,000, which included a "10% control premium [that] represents the premium a strategic buyer would pay to acquire a controlling stake in the Company." Ex. G (DOL0008725).

**Disputed on the grounds that Ex. G (DOL008725) is not legible and does not appear to include the exact quoted language included in the Secretary's statement.**

10.     In 2005, Alex Meshechok ("Meshechok") was a Managing Partner at CSG and worked on the Transaction on behalf of the Sellers. On October 22, 2014, Meshechok, pursuant to FRCP 30(b)(6), testified on behalf of CSG as the organization's designated witness. Ex. H.

**Admitted, except the citation to the record on which the Secretary relies does not support his contention that the work Meshechok performed on the Transaction was on behalf of the Sellers.**

<div align="center">

**THE ESOP FORMATION COMMITTEE**

</div>

11.     At CSG's suggestion, Rembar formed a Committee for the Formation of the Rembar Company, Inc. Employee Stock Ownership Plan (the "Formation Committee") to retain a valuation company to prepare a preliminary valuation. See Ex. H at 101:22-102:4; see also Ex. I at 21:4-23:2.

**Admitted.**

12.     CSG recommended that the Formation Committee retain Empire Valuation Consultants, LLC ("Empire") as to the then present fair market value of Rembar stock. See Ex. H at 100:6-102:4; see also Ex. I at 21:4-23:2.

**Disputed as the citations to the record do not support the Secretary's statement that "CSG recommended that the Formation Committee retain Empire." Ex. H references testimony wherein the deponent states he does not recall whether CSG recommended Empire to Rembar (Ex. H, 100:10-13), and Ex. I. simply references testimony from Griswold that he was contacted by Alex Mesechok, not that CSG made any specific recommendation to the Formation Committee.**

## FORMATION COMMITTEE HIRES EMPIRE

13.     On February 8, 2005, the Formation Committee retained Empire to consult informally with CSG and to prepare a preliminary valuation. Ex. J.

**Admitted.**

## EMPIRE NEGOTIATES REMBAR'S VALUE WITH CSG

14.     Before issuing its Preliminary Valuation, Empire engaged in negotiations with CSG over the value of Rembar's stock. See Ex. H at 114:1-20; see also Ex. I at 92:2-95:6.

**Admitted.**

15.     Empire sought a purchase price for Rembar in the high $13 million dollar area and CSG wanted the ESOP to pay the Sellers $20 million. See Ex. I at 93:2¬94:21.

**Disputed as the citation does not indicate that Empire "sought" that price or that CSG "wanted the ESOP to pay the Sellers $20 million" – the citation only references deposition testimony that the deponent believed that they "verbally stated something in the high 13 millions and they said 20 million," which does not support the Secretary's statement as stated.**

16.     CSG negotiated with Empire in an effort to have them increase their Preliminary Valuation conclusion on ". . . factors such as the discount rate, for example, like what is the biggest driver of valuations? It's the weighted average cost of capital. I think we felt that given the risk factors of the company that it should have been -- probably been lower." See Ex. H at 109:19-110:16; see also Ex. I at 92:2-96:19.

**Admitted.**

17.     Empire concluded that "we would go to 15.5 [million] and . . . we presented that is our number . . . [and] . . . we would not go any higher." Ex. I at 92:2-96:19.

   **Admitted.**

18.     After agreeing through negotiations with CSG to a valuation conclusion of $15.5 million, Empire drafted its Preliminary Valuation, which concluded that the value of 100% of Rembar stock was 15.5 million. See Ex. I at 97:16-98:11.

   **Disputed as the referenced "Ex. I" does not include pages 97-98 to confirm the Secretary's statement, therefore the Secretary's statement cannot be treated as fact.**

### EMPIRE ISSUES PRELIMINARY VALUATION

19.     On March 4, 2005, Empire issued its Preliminary Valuation to the Formation Committee c/o Walter Pastor, who was a Rembar officer named to lead the Formation Committee. Ex. K at 3 (Firor 00243).

   **Admitted.**

20.     The Preliminary Valuation concluded that as of February 15, 2005, the fair market value of 100% of Rembar's common stock was $15.5 million, on a controlling interest basis, as of February 15, 2005, for potential ESOP Transaction purposes. Ex. K at 13 (Firor 00253).

   **Admitted in part - the record citation also says that the appraisal was subject to "the attached Statement of Limiting Conditions."  *See* Ex. K at 13 (Firor 00253).**

21.     The Preliminary Valuation, like the Final Valuation, for the ESOP, dated June 16, 2005, included the application of a 25% control premium. Compare Ex. K (Firor00249-Firor00252), with Ex. L (DOL0008024-DOL0008026).

   **Admitted.**

22.     The Preliminary Valuation, like the Final Valuation for the ESOP, used a Weighted Average Cost of Capital (WACC) discount rate that was derived using a capital structure of 50% debt to 50% equity. Compare Ex. K at 11-12 (Firor 00248-Firor00249); with Ex. L at 45-46 (DOL0008016-DOL008017).

     **Admitted.**

23.     In 2005 it was Empire's policy to share preliminary valuations only with the party that retained them. Ex. I at 41:3-14.

     **Disputed as the testimony referenced in the citation does <u>not</u> state that Empire's policy was to "only" share it with the party that retained them.**

24.     On March 11, 2005, Meshechok (CSG) emailed Firor confirming Empire was sending the Preliminary Valuation to CSG and would be available to Firor, as well as clarifying that

> The valuation is preliminary but in our experience there is no difference between the preliminary and the final valuation unless the business' performance changes materially. The final valuation typically just affirms the preliminary value and is provided, along with a fairness opinion solely to the Independent Trustee within a week or two of the transaction closing

Ex. M.

     **Admitted.**

25.     On March 11, 2005, Firor emailed Meshechok and confirmed that

> Walter [Pastor] has the package [Preliminary Valuation] . . . and he was going to make a copy for me, but I would rather get a copy directly and electronically as was promised. We figured that Walter was some sort of key for the formation of the ESOP, but he was never told that he had an official capacity. That choice is fine with everyone.
>
> Stan [Bulua] called to explain why the valuation is preliminary also. I know [sic] understand. I was concerned, as that number [15.5 million] is the make or break decision to move forward. I am comfortable that the number should stand.

Ex. M.

     **Admitted.**

## FIROR APPOINTS FBTS TRUSTEE

26.    Following issuance of the Preliminary Valuation, CSG approached FBTS and proposed that FBTS serve as trustee for the ESOP. Ex. H at 41:21-42:3; see also Ex. P at 12:7-13.

   **Admitted.**

27.    On April 1, 2005, Firor signed an engagement letter appointing FBTS to act as the ESOP's trustee for the Transaction. Ex. B

   **Disputed, in that Ex. B reflects that Firor countersigned an engagement letter from FBTS that is stated to be signed as of April 13, 2005, not April 1, 2005.**

28.    FBTS' engagement agreement required it to hire Empire as its financial advisor. Ex. B at DOL0019921- DOL0019931.

   **Disputed, as the referenced exhibit does not indicate that FBTS was "required" to hire Empire.  Rather, paragraph 9(a) of Ex. B provides that FBTS shall retain their "own independent financial advisor of its choosing to assist in the evaluation of the proposed transaction" and paragraph 11(a) then indicates that that FBTS' engagement was contingent on Rembar's ESOP committee hiring Empire as an independent financial advisor.**

29.    CSG instructed Empire to send FBTS an engagement letter so that FBTS could retain Empire as its financial advisor. Ex. I at 95:11-13.

   **Disputed.  The cited testimony does not clearly state that Empire was instructed to send FBTS an engagement letter so that FBTS could retain Empire.  Rather, FBTS was contacted by CSG to serve as trustee for the ESOP.  *See* Ash, 12:7-13:18; Meshechok, 41:21-42:3.**

30.     On April 5, 2005 FBTS retained Empire. Ex. O.

     **Admitted.**

31.     FBTS retained Brian Snarr ("Snarr") an attorney from the law firm Morrison Cohen as its

legal counsel for the Transaction. Ex. N at 12:3-5.

     **Admitted.**

32.     FBTS formed an Employee Benefits Committee ("EB Committee") staffed solely by its

employees to represent the ESOP's interests and vote on whether to approve the Transaction. A

unanimous vote was required to approve the Transaction. Ex. Y at 25:19-29:6.

     **Admitted.**

33.     Among the EB Committee members were: FBTS President Brian Ippensen ("Ippensen"),

FBTS administrative trust officer Kimberly Serbin ("Serbin") and Merri Ash ("Ash") FBTS'

business development officer. Ex. Y at 22:9-14, 68:20-69:10, 203:4-11; Ex. Z at 24:3 -25:1; Ex.

P at 10:1-11:14.

     **Admitted.**

**SECTION 3.2(D) OF THE LIMITATION AGREEMENT**

34.     On May 18, 2005, Snarr emailed Bulua a draft of the Limitation Agreement (the "Draft

Limitation Agreement"), which was one of several stock purchase documents that were drafted

pursuant to the Transaction. Ex. Q.

     **Admitted.**

35.     Section 3.2(d) of the Draft Limitation Agreement is a covenant of the Trust that provides:

> <u>Board of Directors</u>. For so long as the Seller Subordinated Note in favor of Frank
> Firor is outstanding, the Trustee, acting on behalf of the Trust, shall vote all of the
> shares of Common Stock held by the Trust to cause the Board of Directors to be
> at all times comprised of a majority of directors designated by Frank Firor.

Ex. Q at 6.

    **Admitted.**

36.     Firor's Seller Subordinated Note (the "Note") is a 10-year note issued by Rembar to Firor

pursuant to the Seller Subordinated Loan Agreement, which was another negotiated stock

purchase document entered into in order to consummate the Transaction. Ex. R.

    **Admitted**.

37.     The Note had a face value of $5,322,525 and bore interest of five percent (5%) on an

annual basis. Ex R (DOL0016286- DOL0016291).

    **Admitted.**

38.     Snarr explained to FBTS that §3.2(d) was in the Limitation Agreement because Firor did

not want to go forward with the Transaction absent the ability to have effective control of the

board while his notes were outstanding. Ex. N at 88:4-7.

    **Admitted that the testimony cited in support of the Secretary's statement is that the
deponent testified that he "discussed" with FBTS that he was told by the Seller's counsel
that the provision was in the Limitation Agreement because Firor did not want to go
forward with the Transaction absent the ability to have effective control of the board while
his notes were outstanding.**

39.     On June 8, 2015, Bulua emailed Snarr acknowledging Snarr's position that "since Frank

[Firor] would be in control of Rembar he should not get out of the covenant [not to compete] if

he has control over whether he is being paid on his note." Ex. T.

**Admitted that the email in Ex. T from Bulua to Snarr includes Bulua's recollection of what Snarr allegedly said to him.**

40.     The June 8, 2015 email's statement that "Frank would be in control of Rembar" was a specific reference to §3.2(d) and Firor's ability to control the board. Ex. N at 121:8-22.

**Disputed to the extent that the referenced Ex. N testimony does not makes a specific reference to §3.2(d).  The record citation only discusses Snarr's recollection that "Frank and Stan had negotiated this because of Frank's standing as a significant creditor of the company."**

41.     On June 9, 2005, Serbin was copied on the June 8, 2005 email discussing Firor's post-transaction control of Rembar. Ex. T.

**Admitted that the record citation to Ex. T reflects that on June 9, 2005, Serbin was copied on the June 8, 2005 email, but disputes the Secretary's description of those emails, as the emails plainly focus on Firor's covenant not to compete.  *See* Ex. T.**

42.     On June 11 or 12, 2005, the EB Committee received for their review, the final version of the Limitation Agreement. Ex. U; see also Ex. P at 142:18-22, 144:6¬8.

**Disputed on the grounds that none of the cited exhibits identify the date on which the EB Committee reviewed the final version of the Limitation Agreement.**

43.     The Limitation Agreement was dated June 17, 2005, and was signed by FBTS EB Committee member Merri Ash on behalf of the ESOP. Ex. U.

**Admitted.**

44.     Ash read the Limitation Agreement once or twice before signing it. Ex. P at 142:18-22, 144:6-8.

**Admitted.**

## NEGOTIATIONS ON BEHALF OF THE ESOP

45.     After being appointed Trustee, FBTS testified that it did not know or inquire whether the Sellers agents had seen the Preliminary Valuation. Ex. Y at 49:16¬50:14.

**Disputed as the cited Exhibit testimony does not support the Secretary's statement that FBTS did not "inquire" if the Seller's agents had seen the Preliminary Valuation – rather, the deponent was asked "In your experience are these preliminary valuations in these scenarios shared with the seller's representatives?" and the deponent responded, "I don't know whether they're shared with the seller's representatives or not."  *See* Ex. Y, 50:3-9.  When the deponent was asked if he knew if the preliminary valuation was shared with the agents, the deponent simply responded, "I do not know."  The deponent was not asked in the cited pages whether he or anyone else "inquired" about this.  *See Id.*

46.     Serbin testified that had FBTS known that Empire had given the Preliminary Valuation to the Sellers and their agents, that that fact would have impacted whether FBTS would have hired Empire to prepare the Final Valuation. Ex. Z at 55:6-57:2.

**Disputed that this is a material or undisputed fact, as the question posed in the cited Ex. Z deposition testimony was a <u>hypothetical</u> question, and the deponent, assuming the hypothetical (not fact), merely responded "I believe it would have had an impact on it."**

47.     FBTS did not negotiate the price the ESOP would pay for Rembar's stock. Ex. Y 205:5-15; 230:3-7.

**Disputed, the cited testimony only states that there was no "back and forth" and that there was only one "offer" of $15.5 million – and this testimony does not support the Secretary's statement that there were no negotiations as FBTS has testified that there were**

negotiations and ignores the fact that Empire's valuation was actually for $16 million.  *See Ippensen, 63:16-66:5, 122:13-123:14, 204:8-17.*

48.     Serbin testified that FBTS typically leaves such negotiations to be conducted by its legal counsel (Snarr) and the Sellers' counsel (Bulua). Ex Z at 59:17-60:5.

**Disputed as the Secretary's statement mischaracterizes the record citation.  In the referenced deposition testimony in Ex. Z, the deponent was asked "Who would have been the point person … to lead the negotiations" on behalf of FBTS and the Rembar ESOP, and the deponent responded that they "typically" leave negotiations between trustee counsel and the company's counsel (seller's counsel).  *See* Ex Z at 59:17-60:5. This testimony does not support the Secretary's statement that FBTS simply "leaves" all negotiations to be conducted by legal counsel.**

49.     Snarr testified that the attorneys do not negotiate price, rather "[w]e negotiate the terms, but the price is sort of something that we are -- for us is a given, because that's what the trustee and its committee and its financial adviser really do." Ex. N at 32:21-33:8.

**Admitted that the quoted language appears in Ex. N at 32:21-33:8, but the previous sentence reads, "We really aren't the ones who do the price negotiations" – therefore that does not mean that the attorneys "do not negotiate price" – just that they are normally not the ones who do.  *See* Ex. N, 33:3-4.**

50.     Bulua testified that "I was not involved in any price negotiations" and does not remember any negotiations occurring. Ex. S at 94:6-13.

**Admitted that San Bulua, former attorney with Danziger & Markoff, testified that he was not involved with the price negotiation.**

51.     The only steps FBTS took to determine the fair market value of Rembar were: (1) a meeting with Rembar management prior to FBTS' engagement, Ex. Y at 26:6¬29:2; 33:1-35:1; Ex. P at 16:6-17:7. (2) an on-site visit to Rembar on April 28, 2005, Ex. P at 17:7-11; (3) receipt of Empire's Final Valuation Report, Ex. L; and (4) a meeting on June 13, 2005, of FBTS' Employee Benefits Committee, which Empire attended by phone. Ex. C.

**Disputed, as FBTS engaged in prudent due diligence and acted in good faith to determine fair market value of Rembar.  *See* FBTS' Statement of Uncontested Facts Pursuant to Red. R. Civ. P. 56 and Local Rule 56.1, ¶¶ 14-24, ¶¶ 54-83, ¶¶ 84-96, ¶¶ 97-112, ¶¶ 113-126.**

### FBTS APPROVES THE TRANSACTION

52.     On June 13, 2005 The EB Committee held a meeting to vote on whether to approve the Transaction (the "Meeting"). Ex. C; Ex. Y at 224: 9-13; Ex. Z at 149:9 -150:21.

**Admitted as Ex. C reflects that on June 13, 2005, the committee unanimously voted to proceed with the Transaction, however, Exs. Y and Z do not contain <u>any</u> of the pages cited in support of the Secretary's statement.**

### EMPIRE'S FINAL VALUATION REPORT

53.     Empire's Final Valuation report concludes "it is our opinion that the fair market value of 100% of the common stock of the Rembar Company, Inc. is reasonably stated at $16,000,000 as of June 16, 2005 for ESOP transaction purposes. It is our further opinion that a purchase by the ESOP is not more than adequate consideration as defined in Section 3(18)(B) of ERISA and the proposed regulations thereunder." Ex. L (DOL0008030).

**Admitted.**

54.     Empire changed its conclusion of Rembar's fair market value from $15.5 million in the Preliminary Valuation to $16 million in the Final Valuation because Rembar's future cash flow projections had changed and not because of arms-length negotiations between the parties. Ex. V at 204:21-205:21.

**Disputed, the record citation is to testimony wherein the deponent does not state that the change was not because of "arms-length negotiations," and, in fact, testified that the prior valuation was based on one methodology and the second on two methodologies and the cited testimony does not state that the change in valuation methods was not negotiated or discussed by the parties.  *See* Ex. V at 205:2-205:21. Therefore, the Secretary's bald statement that the change was not because of "arms-length negotiations" is not accurate based on the cited testimony.**

## EMPIRE'S CALCULATION OF THE CONTROL PREMIUM IN THE FINAL VALUATION

55.     Section G of the Final Valuation is titled Issues of Control: Enterprise Value and begins "since a 100% equity interest, on an enterprise basis, is being valued, application of a premium to the derived freely tradeable value must be considered so as to recognize the prerogatives of control." Ex. L at 47 (DOL0008024).

**Admitted.**

56.     The Final Valuation stated that as 100% owner of Rembar, the ESOP would acquire following prerogatives of control:

·       Determine management compensation;

·       Declare and pay dividends;

·       Sell or acquire assets and/or liabilities;

·       Change the articles of incorporation or by-laws; and

·       Liquidate, dissolve, sell, or recapitalize the company.

Ex. L at 47 (DOL0008024).

**Admitted in part as the "bullet points" are accurately quoted from Ex. L at 47, but Disputed in part because Section G of the Final Valuation (where this is quoted from), is speaking generally about a bidder seeking control of a public company and paying a premium because certain prerogatives, or levels of control, are transferred with percentages of ownership above 50%, and Section G does not make specific reference to Rembar or the ESOP.  *See* Ex. L at 47 (DOL0008024).**

57.     The Final Valuation further explains how it arrived at the control premium:

> In this case, the benefits of a control position in Rembar are more limited than the public company transactions in the above studies, especially given that no immediate efficiencies or synergies are clearly evident for a potential acquirer of the Company, particularly in the case of the ESOP as owner. As a result, a control premium at the lower end of the range was deemed appropriate and 25% was selected.

Ex. L at 48 (DOL0008024).

**Admitted.**

58.     The Final Valuation concluded that the 25% control premium had a value of $2,545,157. *Id*. at 49 (DOL0008025).

**Disputed, as the record citations, Ex. L at p. 49 and Ex. L DOL008025 (which is p. 48), do not indicate or state that the control premium had a value of $2,545,157.**

### EMPIRE'S TREATMENT OF 3.2(d) IN THE FINAL VALUATION

59.     The Final Valuation does not specifically mention §3.2(d) or explain whether the covenant was factored into the report. Ex. L; see also Ex. V at 101:19-21.

**Admitted.**

**ALL PROFFERED EXPERTS IN THIS CASE AGREE THE ESOP PAID TOO MUCH
OF A CONTROL PREMIUM IN LIGHT OF SECTION 3.2(D)**

60.    FBTS's own expert Bradley Van Horn ("Van Horn") concedes that "[o]ne of the effects

of the Limitation Agreement is that full control over the Company's Board of Directors will not

pass to the Trustee until the Seller Subordinated Note is paid in full, which is expected to occur

several years subsequent to the transaction date." Ex. Z at 55.

   **Disputed on the grounds that the record citation to Ex. Z does not contain the expert**

**report of Bradley Van Horn, therefore the citation to the record is incorrect and does not**

**support the Secretary's statement.**

61.    Therefore, Van Horn concludes that for his own valuation of Rembar

> A control premium of 15% was selected to apply in the Guideline Company
> Method consistent with the lower end of the range of market data presented
> above. The selection of a premium from the lower end of the range of market data
> is designed to take into account the economic restrictions associated with the
> Limitation Agreement.

Ex. Z at 55.

   **Disputed on the grounds that the record citation to Ex. Z does not contain the expert**

**report of Bradley Van Horn, therefore the citation to the record is incorrect and does not**

**support the Secretary's statement.**

62.    James Krillenberger, the Secretary's valuation expert, also conducted his own valuation

of Rembar stock as of the Transaction date and opined that an appropriate control premium for

Rembar was 12.5 % or $1.2 million. Ex. W at 13-14.

   **Admitted that the Secretary's expert used a 12.5% control premium in his own**

**valuation done for litigation.**

63.    In Krillenberger's opinion, a 50% reduction of Empire's calculated control premium was

appropriate "in order to linearly recognize that the Rembar ESOP may have received some

element of control but not voting control or control in fact. 12.5% is the midpoint between 25%,

selected by Empire, and 0%." Ex. W at 13-14.

**Admitted that this sentence appears in the Secretary's expert's personal valuation**

**done for litigation.**

64.     Firor's expert, Jesse A. Ultz, agrees with Krillenberger and opines that "[w]orking from

the premise that the cash flows [Empire utilized in its Valuation] were prepared on a non-control

basis" "the Krillenberger Report supports and validates the use of 12.5% control premium." See

Ex. BB at 31 and 41.

**Disputed – Firor's expert specifically disagrees with Krillenberger and instead**

**opines that the correct fair market value of Rembar was $15.5 million and that**

**Krillenberger's valuation was short (*see* Ex. BB at 41); moreover, the Secretary's first**

**"quotation" completely miscites the Report, as that sentence is not to be found anywhere in**

**the Ultz report, thus the second "quote" is completely out of context.**

**EMPIRE'S CALCULATED DISCOUNT RATE IS FLAWED BECAUSE IT RELIED ON**
**AN ASSUMED CAPITAL STRUCTURE THAT DID NOT RESEMBLE REMBAR'S**
**NORMALIZED CAPITAL STRUCTURE**

65.     In valuing Rembar, Empire utilized and weighted evenly, two valuation methodologies:

1) the debt-free Discounted Cash Flow Method ("DCF") and; 2) capitalization of debt-free cash

flow method. Ex. L at 34 (DOL0008011).

**Admitted.**

66.     Empire's DCF analysis required it to utilize explicit forecasts of Rembar's cash flows

together with a required rate of return by which those cash flows can be discounted back to their

present value. Ex. L at 35 (DOL0008012).

**Admitted.**

67.     In order to estimate a rate of return that reflects the risks of the expected cash flows,

Empire calculated the weighted average cost of capital ("WACC") of Rembar. Ex. L at 35-36.

(DOL0008012-DOL0008013).

**Disputed on the grounds that WACC is not referenced on pp. 35-36 in Ex. L (or on**

**DOL0008012-8013) and that where it is referenced, on page 37 (DOL0008014), the report**

**states "[t]he appropriate required rate of return on all invested capital is the Weighted**

**Average Cost of Capital ("WACC"). Development of the WACC requires the cost of debt**

**and the cost of equity for the company to be determined separately."**

68.     The development of the WACC requires the cost of debt and the cost of equity from the

company to be determined separately. Ex. L at 37 (DOL0008014).

**Admitted.**

69.     The lower the discount rate (the WACC) the higher valuation conclusion.  Ex. CC at

64:1-18.

**Disputed in part – the citation to the record testimony is "the lower the discount**

**rate, the higher the valuation conclusion" and the Secretary's insertion of "(the WACC)" is**

**not part of the cited testimony.**

70.     Empire's WACC, or discount rate, in both the Preliminary Valuation and the Final

Valuation, relied on an assumed capital structure of 50% equity and 50% debt. Ex. L at 39

(DOL0008016).

**Admitted, and Empire's basis for its assumption of this capital structure is**

**explained in the Final Valuation as follows: "This waiting takes into account Rembar's lack**

**of debt historically, expected future debt levels that in the short term will be**

uncharacteristically high, and the asset base which can be leveraged against." **Ex. L at 39**
**(DOL0008016).**

71.    But Rembar did not have any debt on its fiscal year-end balance sheets as of May 31,
2000 through 2004 and the month ended April 30, 2005. Ex. L at (DOL0008041-DOL0008042).

**Admitted, and Empire's basis for its assumption of this capital structure is**
**explained in the Final Valuation as follows: "This waiting takes into account Rembar's lack**
**of debt historically, expected future debt levels that in the short term will be**
**uncharacteristically high, and the asset base which can be leveraged against." Ex. L at 39**
**(DOL0008016).**

72.    Empire's assumption of a capital structure of 50% debt and 50% equity operated in the
DCF valuation methodology to lower the discount rate, which increased Rembar's value by $3.9
million. Ex. W at 15.

**Disputed, the record citation does not support the Secretary's statement, as the**
**Exhibit cited (the Secretary's Expert report), simply opines that "Empire's assumption of a**
**capital structure of 50% debt and 50% equity had a significant effect on lowering the**
**discount rate," and then at the end of that paragraph, opines again that "[i]f the capital**
**structure relied on in Empire's analysis <u>was</u> adjusted to 25% debt and 75% equity …,**
**Empire's concluded Fair Market Value of an aggregate controlling interest would decrease**
**by $3,900,000." _See_ Ex. W at 15 (emphasis added).**

73.    A normalized capital structure should consider the subject company's historical capital
structure, long term expected capital structure, and the capital structure of comparable companies
in the subject company's industry. Ex. W at 14.

**Admitted only that the Secretary's Expert includes this statement of opinion in his valuation report that was prepared for the Secretary for this litigation.**

74.     According to Exhibit B-1 of the Empire Report, Rembar has not operated historically with a capital structure of 50% equity and 50% debt, nor is Rembar projected to operate with a capital structure of 50% equity and 50% debt. See Ex. W at 14; see also Ex. L (DOL0008041-DOL0008042).

**Disputed.  In its Final Valuation Report, Empire explains that it is assumed capital structure of 50% equity and 50% debt "takes into account Rembar's lack of debt historically, expected future debt levels that in the short term will be uncharacteristically high, and the asset base which can be leveraged against.  Ex. L at 39 (DOL0008016).**

75.     Empire did not calculate the WACC using a normalized capitalization for Rembar and testifies it selected its assumed capitalization structure of Rembar using its "judgment" based on its "experience." Ex. I at 192:22-193:14.

**Disputed on the grounds that the cited testimony does not support the Secretary's statement that "Empire did not calculate the WACC using a normalized capitalization for Rembar" as the cited testimony asked "how the capitalization structure included in the WACC" was selected, and the response was "It was our judgment" based on "experience" and Empire's review of the "cost of capital… income.  We looked at the conclusion."  *See* Ex. I at 193:1-193:14.**

76.     By weighting the debt part of the equation too high, Empire reduced the discount rate. Ex. W at 15.

**Disputed, as the Secretary's statement is a conclusion, not a fact, and the citation to the record is simply the Secretary's expert's opinion and does not support the "statement"**

that "Empire reduced the discount rate." The citation to the record only sates that

"Empire's selected capital structure <u>resulted</u> in a discount rate lower" than if another

structure was used.  *See* Ex. W at 15 (emphasis added).  Nor does the cited testimony

support the Secretary's statement that Empire improperly weighed the debt part.  *See Id*.

77.     Empire testified that it knew that 50% debt and 50% did not represent a normalized

capital structure for Rembar. Ex. I at 192:22-194:17.

**Disputed as the record citation does not support the Secretary's statement.  The**

**testimony cited does not mention "normalized capital structure" or what Empire "knew"**

**about Empire's "normalized capital structure."  *See* Ex. I at 192:22-194:17.**

78.     Empire identifies two companies that are comparable to Rembar in Exhibit H of its

report, WSI Industries, Inc. and Federal Screw Works. Neither of the companies cited in the

Empire report had a capital structure with a 50% level of debt. WSI Industries had 24.8%

debt/capital and Federal Screw Works had 33.7% debt/capital. Ex. W at 61 (Ex. 9).

**Admitted only that the record citation to Ex. W – the Secretary's Expert report,**

**includes an Ex. 9 that lists the debt/capital of WSI Industries and Federal Screw Works**

**and disputes any legal significance to these numbers or to this Statement.**

### ALL PROFERRED EXPERTS IN THIS CASE AGREE EMPIRE'S ASSUMED CAPITALIZATION WAS FLAWED

79.     FBTS's purported expert Van Horn testified that "I wouldn't choose 50 percent [debt]. So

I think 50 percent is on the high end. If I thought it was the most reasonable data point, I would

have selected it. I think 25 percent is the most reasonable estimate." Krillenberger reached the

same 25% debt (75% equity) conclusion based on the same valuation principal that seeks to

normalize a subject company's capitalization structure to determine an appropriate discount rate.

Ex. CC at 64:12-65:12.

**Disputed as the record citation does not support the Secretary's Statement – the citation to Ex. CC at 64:12-65:12 does <u>not</u> include the quotation cited by the Secretary.  *See* Ex. CC, 64:12-65:12.  Further, the Secretary fails to cite to the record to support its statement that "Krillenberger reached the same 25% debt (75% equity) conclusion."**

80.     The Secretary's expert, James Krillenbeger opined that Empire's selected capital structure is inappropriate because neither extremes, nor the midpoint, represent the normalized capital structure of Rembar. Ex. W at 14.

**Disputed as the record citation does not reference a fact but rather the Secretary's Expert's opinion.**

81.     If the capital structure relied on in Empire's analysis was adjusted to 25% debt and 75% equity, Empire's concluded Fair Market Value of an aggregate controlling interest would decrease by $3,900,000. Ex. W at 15.

**Admitted only that this "statement" appears in the Secretary's Expert valuation on p. 15, but Disputed on the grounds that this is not a fact, but an opinion based on inapplicable assumptions.  *See* Ex. W at 15.**

82.     Ultz opines that it would be reasonable to rely on normalized industry information in order to estimate an appropriate capital structure for Rembar. Ex. AA at 32.

**Disputed on the grounds that this is not a fact, but an opinion, and because the record citation (Ex. AA at 32) does <u>not</u> include a page "32" or "at 32."**

83.     Ultz concluded that the appropriate capitalization for Rembar as of the Transaction date was 35% debt and 65% equity. Ex. BB at ¶ 81.(p. 33).

**Disputed as the record citation does not support the Secretary's statement as the statement was taken out of context.  *See* Ex. BB at ¶ 81 (p. 33).  ¶81 assumes a normalized**

capital structure and the statement in the report references 35% debt capital and 65% equity capital under those circumstances – **not** whether Empire's different calculation method was wrong or improper as implied.  *See Id.*

### THE TRANSACTION

84.     On June 17, 2005, the ESOP purchased 100,000 shares of Rembar stock from the Sellers' for $15.5 million. See Ex. D; see also Exhibits, E; AA, DD and FF.

      **Admitted.**

85.     ESOP paid the Sellers $15.5 million in cash. See Ex. D

      **Admitted only that the ESOP paid $15.5 million for the shares of Rembar, as the record citation does not state that the purchase was "in cash."  *See* Ex. D.**

86.     $12,692,175 was deposited into Firor's bank account. See Ex. D

      **Admitted that the record citation reflects that $12,692,175 was deposited into an account at Bank of New York maintained by Frank Firor.  *See* Ex. D, C.1.**

87.     The ESOP received 100% of the stock from Sellers (ESOP becomes sole shareholder) See Ex. E.

      **Admitted.**

Dated: December 22, 2016            Respectfully submitted,
                                    **FOX ROTHSCHILD LLP**

                                    /s/ Daniel A. Schnapp
                                    Daniel A. Schnapp, Esq.
                                    Elizabeth C. Viele, Esq.
                                    100 Park Avenue
                                    Suite 1500
                                    New York, NY 10017
                                    (212) 878-7900 (phone)
                                    (212) 692-0940 (facsimile)

                                    *Attorneys for Defendant First Bankers Trust Services, Inc.*