UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
EDWARD HUGLER, Acting Secretary of      :
Labor, United States Department of Labor,  :
              Plaintiff,        :        **OPINION AND ORDER**
                                  :
v.        :        12 CV 8649 (VB)
                                  :
FIRST BANKERS TRUST SERVICES, INC.      :
and REMBAR EMPLOYEE STOCK      :
OWNERSHIP PLAN,      :
               Defendants.        :
-------------------------------------------------------------x

Briccetti, J.:

      Plaintiff Edward Hugler,[1] Acting Secretary of the United States Department of Labor (the

"Secretary"), brings this action against defendants First Bankers Trust Services, Inc. ("First

Bankers"), and the Employee Stock Ownership Plan of the Rembar Company, Inc. (the

"ESOP"),[2] asserting First Bankers breached fiduciary duties owed under the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., and also

improperly caused the ESOP to engage in a prohibited transaction under ERISA.

      Before the Court are First Bankers's motion for summary judgment (Doc. #118) and the

Secretary's cross-motion for partial summary judgment (Doc. #134).

      For the reasons set forth below, both motions are DENIED.

      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

---

[1]    Edward Hugler is substituted for Thomas E. Perez.  See Fed. R. Civ. P. 25(d) (providing for automatic substitution of a public officer's successor when the officer ceases to hold office while the action is pending).  Secretary of Labor Thomas E. Perez was previously substituted for former Acting Secretary of Labor Seth D. Harris.  Acting Secretary of Labor Seth D. Harris was previously substituted for former Secretary of Labor Hilda L. Solis.

[2]    The ESOP is a named defendant "solely for the purpose of ensuring complete relief among the parties under Federal Rule of Civil Procedure 19."  (Compl. ¶ 4).

**BACKGROUND**

I.    <u>Factual Background</u>

The parties have submitted briefs, statements of material facts, and declarations with supporting exhibits, which reflect the following factual background.

    A.    <u>The Parties</u>

In 2005, The Rembar Company Inc. ("Rembar") was a closely-held corporation located in Dobbs Ferry, New York.  Rembar manufactured and distributed precision parts and components made from refractory metals, and distributed refractory metals in raw form to lower-volume producers.

First Bankers is a trust company based in Quincy, Illinois, that acts as trustee and custodian for employee benefit and personal trust accounts.  In April 2005, Rembar retained First Bankers to serve as trustee for the Rembar ESOP in connection with a transaction in which the ESOP would purchase 100% of Rembar's stock from selling shareholders Frank Firor, Virginia Keilty, and Rosemary Brockett.

    B.    <u>Rembar Evaluates the Feasibility of Establishing an ESOP</u>

Prior to the 2005 ESOP transaction, Firor was Rembar's chief executive officer, chairman of the board of directors, president, and majority stockholder.  Firor owned 81.88% of Rembar's then outstanding shares, Keilty owned 11.77%, and Brockett owned 6.35%.

In January 2005 after Firor became interested in selling his Rembar shares, Rembar engaged Corporate Solutions Group ("CSG"), an investment bank, to evaluate the feasibility of

establishing an ESOP[3] to purchase Rembar stock from its owners.  CSG informally estimated that the value of 100% of Rembar's common stock was approximately $15,719,000.  This figure included a 10% control premium, which "represent[ed] a premium a strategic buyer would pay to acquire a controlling stake in [Rembar]."  (Sullivan Decl. Ex. G, DOL0008724, DOL0008726).

At CSG's suggestion, Rembar established an ESOP formation committee to retain a valuation company to prepare a preliminary valuation.  Firor participated in the formation committee's activities.

On February 8, 2005, the formation committee retained Empire Valuation Consultants, LLC ("Empire") to prepare a preliminary valuation of the fair market value of Rembar's stock. In connection with the preliminary valuation work Empire performed, it reviewed a confidential information memorandum prepared by CSG that contained historical and financial data concerning Rembar.

Empire and CSG engaged in discussions regarding the value of Rembar's stock before Empire issued its preliminary valuation.  Terence Griswold, a managing director at Empire, testified that his firm initially proposed a valuation "in the high 13 millions, and [CSG] said 20 million."  (Sullivan Decl. Ex. I, at 93:2-16).  CSG urged Empire to increase its preliminary valuation conclusion, and specifically sought to persuade Empire to adjust valuation factors such as the discount rate.  Empire and CSG ultimately agreed to a valuation of $15.5 million after Empire communicated to CSG, "We're not going any higher."  (Id. Ex. I, at 96:18-19).

---

[3]      ESOPs are a type of pension plan that primarily invest in the stock of the company that employs the plan participants.  Fifth Third Bancorp v. Dudenhoeffer, 134 S. Ct. 2459, 2463 (2014).

Empire subsequently issued a preliminary valuation on March 4, 2005, to the Rembar formation committee c/o Walter Pastor (Pastor was a Rembar officer named to head the formation committee).  The preliminary valuation was also shared with Firor.  Empire's preliminary valuation concluded that as of February 15, 2005, for potential ESOP purposes, the fair market value of 100% of Rembar's common stock was $15.5 million, on a controlling interest basis.  This valuation conclusion included the application of a 25% control premium and used a weighted average cost of capital discount rate that was calculated based on a capital structure of 50% debt and 50% equity.

C.     Engagement of First Bankers as ESOP Trustee

On April 13, 2005, following the issuance of the preliminary valuation and at CSG's suggestion, Firor signed an engagement letter on behalf of Rembar appointing First Bankers to act as the ESOP's independent trustee in connection with the transaction.

Paragraph 9(a) of the FBTS engagement letter states:

> As Trustee, First Bankers shall be entitled . . . to:  (a) retain the Trustee's own independent financial advisor of its choosing to assist in the evaluation of the proposed transactions, and to perform the annual valuation and any other required valuations, which advisor is acceptable to the Company; provided however, that the Company shall not unreasonably withhold such acceptance.

(Sullivan Decl. Ex. B, at DOL0019924).  Paragraph 11 then provides:

> First Bankers's continued engagement as Trustee is contingent upon the following:
>
> (a) First Bankers's engagement of Empire Valuation Consultants to serve as its independent financial advisor;
> (b) First Bankers's approval of valuation report(s) and/or fairness opinion(s) furnished by such independent financial advisor; and
> (c) First Bankers's approval of the Trust Agreement and associated documents.

(Id. at DOL009925).

4

After the ESOP engaged First Bankers, CSG instructed Empire to send First Bankers an engagement letter.  Empire complied and sent First Bankers an engagement letter dated April 5, 2005, which was countersigned by First Bankers and Rembar as of May 25, 2005.  The letter specified that Empire was engaged to act as financial advisor to First Bankers in its capacity as trustee to the ESOP.  It also stated that Empire would "express its updated opinion as to the fair market value of Rembar's common stock on, or before a date where [sic] Empire will present its conclusions to the Trustee" and "render a fairness opinion as of the Transaction Date with respect to the acquisition of the common stock by the ESOP."  (Schnapp Decl. Ex. 3, at 1).  The engagement letter further stated that Empire "will represent only the interests of the ESOP participants and beneficiaries."  (Id.).  Empire's initial engagement letter with the Rembar ESOP formation committee had stated it "will represent only the interests of the ESOP participants and beneficiaries, acting through committee and the ESOP trustee when selected."  (Id. Ex. 4, at 1-2).

First Bankers also retained Brian Snarr, an attorney of the law firm Morrison Cohen LLP, as its legal counsel in connection with the 2005 ESOP transaction.

As part of its role as trustee, First Bankers formed an employee benefits committee (the "EB committee") to represent the ESOP's interests and vote on whether to approve the 2005 transaction.  Such approval required the unanimous vote of the EB committee members.  Among the eight First Bankers employees who served on the EB committee were certified public accountants, holders of masters of business administration degrees, and licensed attorneys. Specifically, the EB committee members included:  First Bankers's president, Brian Ippensen; First Bankers's administrative trust officer, Kimberly Serbin; and First Bankers's business development officer, Merri Ash.

Prior to its appointment as trustee of the Rembar ESOP, the EB committee conducted a pre-acceptance review process to determine the feasibility of the proposed transaction.  This review process involved an examination of Rembar and its business (including its performance and financial history), and a review of the proposed transaction structure.

D.      The Limitation Agreement

One of the agreements entered into as part of the Rembar ESOP transaction was a limitation agreement dated as of June 17, 2005, among Rembar, First Bankers as the ESOP's trustee, and the selling shareholders.  The recitals of the limitation agreement provide, inter alia:

> [T]he price the Trust proposes to pay for the Common Stock is based in part on a valuation of the Common Stock that contemplates certain limitations on the base and incentive compensation paid to certain employees of the Company in the future, as well as other operational limitations, covenants and obligations of the parties hereto as set forth in this Agreement; and . . . the Trust will not, however, purchase the Common Stock unless the Company covenants to take certain steps provided herein to assure that the value of the Common Stock will not be diminished following such purchase.

(Schnapp Decl. Ex. 15, at DOL0016293).

Section 3.2(d) of the limitation agreement contains a covenant of First Bankers as trustee, which provides:

> Board of Directors.  For so long as the Seller Subordinated Note[4] in favor of Frank Firor is outstanding, the Trustee, acting on behalf of the Trust, shall vote all of the shares of Common Stock held by the Trust to cause the Board of Directors to be at all times comprised of a majority of directors designated by Frank Firor.

(Schnapp Decl. Ex. D, at 6).

---

[4]      The term "Seller Subordinated Note" refers to a 10-year promissory note issued by Rembar to Firor pursuant to a seller subordinated loan agreement, which was another document entered into in connection with the 2005 Rembar ESOP transaction.  The "Seller Subordinated Note" had a face value of $5,322,525 and bore an annual interest rate of five percent.

Other key provisions of the limitation agreement include Section 3.1(a), which limits

Firor's annual compensation from Rembar for the following five fiscal years to $75,000 per year,

and Section 3.1(c), which requires Rembar to distribute the company's annual net earnings as a

shareholder dividend, unless the board of directors exercises its discretion to retain up to

$100,000 of its net earnings each year.

E.     First Bankers's Diligence, Negotiations, and Approval of the Transaction

On April 12, 2005, First Bankers's counsel, Snarr, sent a request for due diligence

materials to Rembar's counsel, Stanley Bulua, asking for numerous documents related to

Rembar's corporate formation, business matters, risk factors, financials, and tax information,

among other things.  (Schnapp Decl. Ex. 6).  Snarr also prepared a due diligence memorandum, a

draft of which was circulated to Bulua on May 17, 2005, identifying various issues relating to the

proposed ESOP transaction, including issues with Rembar's financial statements, and

documentation that Rembar had not yet provided.  Before it approved the transaction, First

Bankers also received an "ESOP Transaction Memorandum" prepared by Bulua, along with a

due diligence report prepared by Snarr.  First Bankers performed its own due diligence by, inter

alia, making an on-site visit to Rembar on April 28, 2005, accompanied by representatives from

Empire and its legal counsel; reviewing financial information provided by Rembar; and

reviewing the memoranda and analyses prepared by its counsel and Empire.  Empire also

conducted a diligence interview with Rembar representatives by telephone.

First Bankers claims it reviewed Empire's final valuation in draft form to ensure the

completeness of its information, scrutinize and understand the methodologies used, and

formulate any questions it may have based on the information it contained.  The Secretary

7

disputes whether First Bankers actually engaged in such a review of Empire's report, pointing

out that much of Ippensen's testimony that First Bankers relies on discusses how First Bankers

<u>generally</u> reviews final valuation reports in draft form and conducts due diligence, as opposed to

what kind of review First Bankers <u>actually</u> engaged in here.  (<u>See</u>, <u>e.g.</u>, Schnapp Decl. Ex. 24, at

98:17-106:5).

 The parties also dispute whether and the extent to which First Bankers and Empire

engaged in discussions regarding Empire's valuation ahead of the June 13, 2005, EB committee

meeting.

 According to the Secretary, the <u>only</u> steps First Bankers took to determine the fair market

value of Rembar were:  (i) participate in a meeting with Rembar management prior to the

engagement of First Bankers; (ii) conduct an on-site visit at Rembar on April 28, 2005;

(iii) receive Empire's final valuation report; and (iv) hold an EB committee meeting on June 13,

2005, in which Empire participated by telephone.  The Secretary disputes that First Bankers

actually analyzed Rembar's financial information, Empire's valuation reports, or the legal due

diligence memoranda.

 First Bankers claims it used the information it obtained from its initial due diligence

process to test the reasonableness of Empire's final valuation.  But, again, the Secretary points

out that the Ippensen testimony upon which First Bankers relies in making this statement

discusses what First Bankers <u>generally</u> does, not what it <u>actually did</u> with respect to the Rembar

transaction.  (<u>See</u> Schnapp Decl. Ex. 24, at 103:20-104:20).  Serbin, on the other hand,

affirmatively testified that First Bankers went through Empire's valuation report page-by-page to

discuss each section it contained.  (Schnapp Decl., Ex. 25, at 116:21-117:16).

On June 13, 2005, the EB committee held a meeting to consider whether to approve the Rembar ESOP transaction.[5]  Snarr explained the structure of the proposed transaction and Joe Eckl of Empire discussed Empire's final valuation.  Notes from the meeting indicate the EB committee members asked questions during Snarr and Eckl's presentations, and the issues discussed include:  Rembar's capital structure and tax status, the structure of the ESOP, the structure of the transaction, and the financing for the transaction.  Eckl's presentation concluded by valuing Rembar at $16 million.  Following this discussion, the EB committee voted unanimously to approve the Rembar ESOP transaction.

F.     Empire's Final Valuation

Consistent with Eckl's presentation at the EB committee meeting, Empire's final valuation report dated June 16, 2005, concludes:

> [I]t is our opinion that the fair market value of 100% of the common stock of the Rembar Company, Inc. is reasonably stated at $16,000,000 as of June 16, 2005 for ESOP transaction purposes.  It is our further opinion that a purchase by the ESOP is not more than adequate consideration as defined in Section 3(18)(B) of ERISA and the proposed regulations thereunder.

(Sullivan Decl. Ex. L, at 53).

---

[5]     First Bankers contends it had an additional meeting regarding the ESOP transaction in late May or early June, but there is little record evidence such a meeting took place.  First Bankers relies on Ippensen's testimony that, "We would have had, -- generally we have two committee presentations.  And I know that there was one just prior to the transaction, -- several days before.  I recall having a conversation late May . . . just talking about the Rembar transaction.  So I know that there would have been something before the June meeting." (Schnapp Decl. Ex. 24, 106:15-107:2).  Ippensen later testified, "I just don't remember if at the end of May or the first part of June that there was another follow up, -- or there was a first committee call presentation.  And it may have been just amongst our group."  (Id. at 178:22-179:5).

In reaching its valuation conclusion, Empire analyzed and relied on Rembar's reviewed financial statements for the five years ended May 31, 2000 through 2004, internally prepared results for the eleven months ended April 30, 2005, and financial projections provided by Rembar's management.

G.     The Transaction

On June 17, 2005, the ESOP purchased 100% of the 100,000 issued and outstanding shares of Rembar from the selling shareholders for $15.5 million (representing $155 per share). In order to finance the stock purchase, the ESOP borrowed $15.5 million from Rembar, to be paid back over a 26-year term at an annual interest rate of 4.83%.  The ESOP loan was secured by the shares purchased from the selling shareholders.  Rembar, in turn, financed the ESOP loan with $4 million cash on hand, $5 million bank term loans, and a $6 million one-day loan. Rembar also borrowed $6.5 million from the selling shareholders in exchange for subordinated notes, which Rembar then used to pay back the $6 million one-day loan.

H.     Subsequent Events

Following the consummation of the 2005 ESOP transaction, Rembar made payment on its debt obligations until 2009, when it became unable to service its debts as they became due. On July 30, 2009, as part of a restructuring, the ESOP surrendered the unallocated Rembar shares to Rembar, and Rembar purchased the allocated shares held by the ESOP for $15,500 (representing $1.0075 per share), cancelled the ESOP loan, and terminated the ESOP.  (Schnapp Decl. Ex. 16; Sullivan Opp'n Decl. Ex. EE).  The selling shareholders also cancelled the outstanding debt Rembar owed them pursuant to the subordinated notes.  (Schnapp Decl. Ex. 18, at 5).

II.   <u>Procedural History</u>

On November 28, 2012, the Secretary filed its initial complaint against Firor, First

Bankers, and the ESOP.  (Doc. #1).  Firor moved to dismiss pursuant to Rule 12(b)(6), and the

Secretary filed an amended complaint on May 3, 2013.  (Doc. #15).  The amended complaint

alleges that in connection with the 2005 ESOP transaction, (i) First Bankers and Firor breached

their fiduciary duties to the ESOP in violation of ERISA § 404(a)(1)(A), (B) & (D), 29 U.S.C.

§ 1104(a)(1)(A) & (B); (ii) First Bankers caused the ESOP to engage in a prohibited transaction

in violation of ERISA § 406(a)(1)(A) & (D), 29 U.S.C. § 1106(a)(1)(A) & (D); and (iii) Firor

was subject to equitable relief, including disgorgement.

On June 17, 2013, Firor again moved to dismiss (Doc. #21); the Court denied that motion

on January 13, 2014 (Doc. #28).

Following a lengthy and contentious discovery period, the parties participated in the

Court-annexed Mediation Program, which resulted in a settlement agreement between the

Secretary and Firor.  On May 3, 2016, the Court entered a Consent Partial Judgment and Order

pursuant to which, <u>inter alia</u>, (i) Firor neither admitted nor denied the allegations in the amended

complaint; (ii) Firor is permanently enjoined and restrained from engaging in any further action

in violation of Title I of ERISA and from acting as a fiduciary or service provider to any

employee benefit plan subject to Title I of ERISA; (iii) Firor agreed to pay $1,090,090 to the

Rembar ESOP for distribution to the individual ESOP participants and beneficiaries; and (iv) the

Secretary agreed that such payment shall operate as a dollar-for-dollar offset of any amount

owed by First Bankers to the ESOP resulting from a settlement or judgment in the present

litigation.  (Doc. #108).

On August 12, 2016, First Bankers moved for summary judgment (Doc. #118), and on November 21, 2016, the Secretary cross-moved for partial summary judgment (Doc. #134).

## DISCUSSION

I.  <u>Summary Judgment Standard</u>

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law . . . .  Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party.  <u>See id</u>.  The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." <u>Wilson v. Nw. Mut. Ins. Co.</u>, 625 F.3d 54, 60 (2d Cir. 2010) (citation omitted).  It is the moving party's burden to establish the absence of any genuine issue of material fact.  <u>Zalaski v. City of Bridgeport Police Dep't</u>, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party has failed to make a sufficient showing on an essential element of her case on which he has the burden of proof, then summary judgment is appropriate.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. at 323.  If the non-moving party submits "merely colorable" evidence, summary judgment may be granted.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 249-50.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to

the material facts, and may not rely on conclusory allegations or unsubstantiated speculation."
Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal citations omitted).  The
mere existence of a scintilla of evidence in support of the non-moving party's position is
likewise insufficient; there must be evidence on which the jury could reasonably find for him.
Dawson v. Cnty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws
all permissible factual inferences in favor of the non-moving party.  Dallas Aerospace, Inc. v.
CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  If there is any evidence from which a
reasonable inference could be drawn in favor of the non-moving party on the issue on which
summary judgment is sought, summary judgment is improper.  See Sec. Ins. Co. of Hartford v.
Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004).

In deciding a motion for summary judgment, the Court need only consider admissible
evidence.  Nora Bevs., Inc. v. Perrier Grp. of Am. Inc., 164 F.3d 736, 746 (2d Cir. 1998).

II.    Timeliness of the Secretary's Claims

As an initial matter, First Bankers argues the Secretary's claims should be dismissed as
untimely under Section 413 of ERISA.  Section 413(1) of ERISA provides:

> No action may be commenced under this subchapter with respect to a fiduciary's
> breach of any responsibility, duty, or obligation under this part, or with respect to a
> violation of this part, after the earlier of--
> (1) six years after (A) the date of the last action which constituted a part of the
> breach or violation, or (B) in the case of an omission the latest date on which the
> fiduciary could have cured the breach or violation.

29 U.S.C. § 1113.  According to First Bankers, the last action which constituted a part of the
alleged breach or violation occurred when the Rembar ESOP transaction closed on June 16,
2005.  The Secretary commenced this action by filing its initial complaint on November 28,

2012, which is well after the expiration of the six-year statutory period specified in Section 413(1).

The Secretary argues First Bankers has waived its affirmative defense that the Secretary's claims are time-barred under Section 413(1) because First Bankers signed three agreements in which it agreed not to raise a timeliness defense in exchange for the Secretary's agreement to delay filing this action. First Bankers does not dispute that it entered into these agreements. Instead, it argues that because the six-year limitation contained in Section 413(1) is a statute of repose, and not a statute of limitations, it is an absolute barrier to an untimely suit that is not subject to equitable tolling principles.

First Bankers's argument is not persuasive.

First Bankers is correct that "[s]tatutes of limitations, but not statutes of repose, are subject to equitable tolling, a doctrine that 'pauses the running of, or tolls, a statute of limitations when a litigant has pursued his rights diligently but some extraordinary circumstance prevents him from bringing a timely action.'" CTS Corp. v. Waldburger, 134 S.Ct. 2175, 2182 (2014) (quoting Lozano v. Montoya Alvarez, 134 S.Ct. 1224, 1231–1232 (2014)). Equitable tolling applies to statutes of limitations because "their main thrust is to encourage the plaintiff to 'pursu[e] his rights diligently,' and when an 'extraordinary circumstance prevents him from bringing a timely action,' the restriction imposed by the statute of limitations does not further the statute's purpose." CTS Corp. v. Waldburger, 134 S.Ct. at 2183 (2014) (quoting Lozano v. Montoya Alvarez, 134 S.Ct. at 1231–1232). In contrast, statutes of repose "generally may not be tolled, even in cases of extraordinary circumstances beyond a plaintiff's control." CTS Corp. v. Waldburger, 134 S.Ct. at 2182.

Equitable tolling, however, is not at issue here.  Instead, the timeliness of the Secretary's suit turns on whether Section 413(1) may be tolled by express agreement of the parties.

First Bankers points to Harris v. Bruister, 2013 WL 6805155, *4-*6 (S.D. Miss. Dec. 20, 2013), in which the court concludes "the six-year limitation period set forth in § 413(1) is a jurisdictional prerequisite to suit that cannot be waived or tolled."  In so holding, the Bruister court relied on the Fifth Circuit's decisions in Radford v. General Dynamics Corp., 151 F.3d 396, 400 (5th Cir. 1998) and Archer v. Nissan Motor Acceptance Corp., 550 F.3d 506, 508 (5th Cir. 2008).  In Radford v. General Dynamics Corp., the Fifth Circuit held that "Section 413 of ERISA is a statute of repose, establishing an outside limit of six years in which to file suit, and tolling does not apply."  151 F.3d at 400.  In Archer v. Nissan Motor Acceptance Corp., it went further and held that the limitations period in the Equal Credit Opportunity Act is a "statute of repose establishing with clear text a 'jurisdictional bar' under which 'federal courts lack the power to extend the period to allow for late adjudication of claims.'" 550 F.3d at 508 (quoting Davis v. Johnson, 158 F.3d 806, 810 (5th Cir. 1998)).

But the issue before the Radford court was whether ERISA's six-year limitation was tolled during exhaustion of administrative remedies for a so-called Varity claim,[6] and the Archer court considered whether equitable tolling could operate to extend the time limitation set forth in a statute of repose.  Neither case considered whether an express agreement among consenting and knowing parties may toll a statute of repose.  Moreover, the Supreme Court has "clarified that time prescriptions, however emphatic, 'are not properly typed 'jurisdictional.''"  Arbaugh v.

---

[6]      A "Varity" claim is a suit for individualized equitable relief under Section 502(a)(3) of ERISA as recognized in Varity v. Howe, 516 U.S. 489 (1996).

Y & H Corp., 546 U.S. 500, 510 (2006) (quoting Scarborough v. Principi, 541 U.S. 401, 414, (2004)); see also Perez v. PBI Bank, Inc., 69 F. Supp. 3d 906, 910 (N.D. Ind. 2014) ("The entire structure of ERISA supports the conclusion that the repose provision at issue here is not a jurisdictional bar, but rather operates as a defense to an action.").  Accordingly, this Court declines to extend the reasoning of Harris v. Bruister, Radford v. General Dynamics Corp., and Archer v. Nissan Motor Acceptance Corp., and conclude that an affirmative defense based on a statute of repose may never be waived by express agreement of a party.[7]

First Bankers also urges this Court to consider the Second Circuit's decision in Police & Fire Retirement System of the City of Detroit v. IndyMac MBS, Inc., 721 F.3d 95 (2d Cir. 2013), in which the Second Circuit held that the class action tolling doctrine established in American Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974),[8] does not apply to the three-year statute of repose in Section 13 of the Securities Act of 1933 (the "Securities Act").

In concluding that the Securities Act's statute of repose is not tolled by the filing of a class action complaint, the Second Circuit emphasized that statutes of repose "'create a substantive right in those protected to be free from liability after a legislatively-determined

---

[7]     First Bankers also cites Fulghum v. Embarq Corp., 785 F.3d 395, 413 (10th Cir. 2015) and Ranke v. Sanofi-Synthelabo, Inc., 436 F.3d 197, 205 (3d Cir. 2006).  These cases both conclude that ERISA Section 413(1) is a statute of repose not subject to equitable tolling, which, for the reasons elaborated above, is inapposite here because the parties entered into an express agreement.  In its reply and opposition brief, First Bankers also relies on Perez v. Mueller, 2014 WL 5305897, *3 (E.D. Wis. Oct. 15, 2014).  The Mueller court states—in reference to Section 413(1)—that the three-year statute of limitations contained in Section 413(2) "can be extended up to six-years, but no further (except in the case of fraud or concealment)."  But this statement appears in dicta and is based on Harris v. Bruister and Radford v. General Dynamics Corp., and thus, for the same reasons discussed above, this Court does not find it persuasive.

[8]     Under American Pipe, "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action."  414 U.S. at 554.

16

period of time.'" Police & Fire Ret. Sys. of the City of Detroit v. IndyMac MBS, Inc., 721 F.3d

95 (2d Cir. 2013) (quoting Amoco Prod. Co. v. Newton Sheep Co., 85 F.3d 1464, 1472 (10th

Cir. 1996)); see also CTS Corp. v. Waldburger, 134 S.Ct. at 2183 ("Statutes of repose effect a

legislative judgment that a defendant should be free from liability after the legislatively

determined period of time.").  But First Bankers's interest in being free from liability after a

legislatively-determined period of time is not implicated when, as here, it has contractually

agreed to waive that right vis-à-vis a particular litigant.  To argue otherwise, after more than

three years of litigation, "is not just wrong, it is ridiculous."  In re Lehman Bros. Securities and

ERISA Litig., 2012 WL 6584524, *2 (S.D.N.Y. Dec. 18, 2012) (internal quotation marks

omitted) (rejecting defendant's argument that notwithstanding its tolling agreement with

plaintiff, plaintiff's claim under the Securities Act was time-barred).

　　　　This Court concludes that "no public policy would be offended by permitting a private

party like [First Bankers] to contract out of [ERISA]'s statute of repose with a particular litigant.

In fact, a very important public interest may be served by doing so."  In re Lehman Bros.

Securities and ERISA Litig., 2012 WL 6584524, *2.  This is because "[t]olling agreements allow

parties to extend statutory periods while they evaluate their claims and defenses in the hope that

they can resolve their dispute without litigation.  In cases such as this one, such agreements can

serve the interests of the parties, the public, and the courts."  Id.

　　　　Accordingly, this Court rejects First Bankers's argument that the Secretary's claims

should be dismissed as untimely.

III.   First Bankers's Fiduciary Duties Under ERISA

ERISA is a remedial statute designed to protect beneficiaries of employee benefit plans.

Slupinski v. First Unum Life Ins. Co., 554 F.3d 38, 47 (2d Cir. 2009).  ERISA does so by

establishing "a comprehensive scheme to govern the conduct of ERISA fiduciaries."  Henry v.

Champlain Enters., Inc., 445 F.3d 610, 618 (2d Cir. 2006).  The general obligations of an ERISA

fiduciary are set forth in Section 404, which requires that a fiduciary investigate proposed

transactions with "the care, skill, prudence, and diligence under the circumstances then

prevailing that a prudent man acting in a like capacity and familiar with such matters would use

in the conduct of an enterprise of a like character and with like aims."  29 U.S.C.

§ 1104(a)(1)(B).  In examining whether a fiduciary has satisfied this requirement, "[t]he court's

task is to inquire whether the individual trustees, at the time they engaged in the challenged

transactions, employed the appropriate methods to investigate the merits of the investment and to

structure the investment."  Henry v. Champlain Enters., Inc., 445 F.3d at 618 (quoting Katsaros

v. Cody, 744 F.2d 270, 279 (2d Cir. 1984)).

In addition to the general fiduciary obligations set forth in Section 404 of ERISA,

Section 406 prohibits "certain categories of transactions believed to pose a high risk of fiduciary

self-dealing."  Henry v. Champlain Enters., Inc., 445 F.3d at 618.  To that end, Section 406

prohibits transactions involving the "sale or exchange . . . of any property between the plan and a

party in interest," including the "acquisition, on behalf of the plan, of any employer security."  29

U.S.C. § 1106(a)(1)(A), (E).  A "party in interest" is defined as "an employee, officer, director, .

. . or a 10 percent or more shareholder" of "an employer any of whose employees are covered by

[the] plan".  29 U.S.C. § 1002(14)(H), (C).

Because Firor was chairman of the board of directors, chief executive officer, president, and 82% shareholder of Rembar, there is no dispute that the June 16, 2015, sale of 100% of Rembar's shares to the ESOP, was a prohibited transaction under Section 406.

However, to encourage employees' ownership of their employer company, Section 408(e) permits the sale of employer stock by a party in interest to an ESOP if the purchase is made for "adequate consideration." 29 U.S.C. § 1108(e). "In transactions involving securities with no known market value, as is the case here, ERISA defines 'adequate consideration' as 'the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan." Henry v. Champlain Enters., Inc., 445 F.3d at 618 (quoting 29 U.S.C. § 1002(18)(B)).

Whether a fiduciary has made a proper determination of "fair market value" depends on whether the parties "are well-informed about the asset and the market for that asset." Henry v. Champlain Enters., Inc., 445 F.3d at 618–19. The fair market value and good faith inquiries are closely intertwined and "both are 'expressly focused upon the conduct of the fiduciaries." Id. (quoting Donovan v. Cunningham, 716 F.2d 1455, 1467 (7th Cir. 1983) (emphasis in original)); see also Eyler v. Comm'r of Internal Revenue, 88 F.3d 445, 455 (7th Cir. 1996) ("ESOP fiduciaries will carry the burden of proving that adequate consideration was paid by showing that they arrived at their determination of fair market value by way of a prudent investigation in the circumstances then prevailing.") (internal quotation marks omitted).

The role of courts in reviewing the adequacy of consideration in an ERISA case is to determine whether the fiduciary can show that the price paid represented a good faith determination of the fair market value of the asset at the time the challenged transaction was

consummated, "not to redetermine the appropriate amount for itself de novo." Henry v. Champlain Enters., Inc., 445 F.3d at 618–19) (quoting Chao v. Hall Holding Co., Inc., 285 F.3d 415, 437 (6th Cir. 2002)).  Accordingly, "the adequate consideration test focuses on the conduct of the fiduciaries in determining the price, not the price itself."  Henry v. Champlain Enters., Inc., 445 F.3d at 618–19.  Furthermore, because Section 404 imposes on the fiduciary a duty to exercise care prudently and with diligence "under the circumstances then prevailing," courts must take care not to judge a fiduciary's actions "from the vantage point of hindsight."  Chao v. Merino, 452 F.3d 174, 182 (2d Cir. 2006) (quoting Katsaros v. Cody, 744 F.2d at 279).

Under ERISA, the fiduciary bears the burden of proving by a preponderance of the evidence that the ESOP received "adequate consideration" for its purchase of company stock. Henry v. Champlain Enters., Inc., 445 F.3d at 619.

IV.    The Present Motions

The Secretary's case centers on its claim that First Bankers approved the ESOP's purchase of Rembar's stock from the selling shareholders for more than adequate consideration. The alleged Section 406 violation can be established only if the "adequate consideration" exemption from Section 406 is not applicable.  Similarly, the Secretary's claim that First Bankers's conduct violated its general duties of prudence under Section 404 is based on its view that First Bankers authorized the ESOP to pay too much for the stock.  The Secretary does not contend the Rembar stock purchase was not undertaken "solely in the interest of the participants" of the ESOP or for any other improper reason, nor does it contend the purchase of Rembar stock, if made for adequate consideration, would have been imprudent for some other reason.  Thus, although payment of adequate consideration is a statutory defense only to a violation of

20

Section 406, and not of Section 404, under the Secretary's theory of this particular case, the Court's inquiry will substantially be the same.

First Bankers contends its conduct and internal procedures demonstrate that it thoroughly investigated the 2005 Rembar ESOP transaction and Empire's valuation report with "ample due diligence to more than satisfy its duties" under Sections 404 and 406.  (Def.'s Br. at 22).

Specifically, First Bankers argues the record demonstrates: (i) it confirmed Empire used complete and accurate information in performing its valuation of Rembar's stock; (ii) Empire was qualified, experienced, and justifiably had First Bankers's full confidence with regard to its advisory and valuation capabilities; (iii) First Bankers conducted its own due diligence before agreeing to be engaged as the Rembar ESOP's trustee; (iv) First Bankers's due diligence prior to approving the 2005 transaction included (a) an on-site visit at Rembar, (b) review of Rembar's financial information, (c) the engagement of Empire as its independent financial advisor, (d) review and analysis of Empire's valuation report, (e) and review of legal due diligence reports; and (v) First Bankers engaged in an active dialogue with its advisors and had at least one EB committee meeting in which its independent financial and legal advisors participated, prior to approving the transaction.  Additionally, First Bankers argues it is entitled to summary judgment because the Secretary cannot show the ESOP has sustained an actual economic loss.

In turn, the Secretary contends that it is entitled to partial summary judgment because the record demonstrates First Bankers failed to determine the fair market value of Rembar in good faith by (i) failing to investigate Empire's independence as a financial advisor prior to relying on its valuation; (ii) failing to review Empire's valuation with sufficient scrutiny and thus failing to

ascertain that the discount rate and control premium conclusions were unfounded; and

(iii) failing to negotiate the price the ESOP paid for Rembar's stock.

      A.    <u>Empire's Independence</u>

According to the Secretary, First Bankers's reliance on Empire's valuation was imprudent because Empire was not truly independent.  The Secretary's contention rests on three principal arguments.  First, the Secretary contends that because First Bankers's engagement as the Rembar ESOP trustee was contingent on hiring Empire as its financial advisor, First Bankers was not actually free to select its own independent financial advisor.  Second, because Empire had already performed preliminary valuation work that was shared with Firor—the principal selling shareholder—Empire's valuation work for First Bankers was conflicted by its prior engagement.  Third, the Secretary claims Empire's valuation conclusions were not based entirely on Empire's view of Rembar's financials, but instead were the result of negotiations with the sellers' agents prior to First Bankers's involvement in the ESOP transaction.

Securing an independent assessment from a financial advisor or legal counsel is evidence of a thorough investigation, but it is not a complete defense against a claim of imprudence.  <u>Chao v. Hall Holding Co., Inc.</u>, 285 F.3d at 430.  "An independent appraisal is not a magic wand that fiduciaries may simply waive over a transaction to ensure that their responsibilities are filled."  <u>Donovan v. Cunningham</u>, 716 F.2d at 1476.  When relying on expert advice, a fiduciary has a duty to investigate the expert's qualifications, ensure the expert has been provided with complete and accurate information, and make certain that reliance on the expert's advice is reasonably justified under the circumstances.  <u>Chao v. Hall Holding Co., Inc.</u>, 285 F.3d at 430; <u>accord</u>.  <u>Howard v. Shay</u>, 100 F.3d 1484, 1489 (9th Cir. 1996).

Moreover, "[o]ne extremely important factor" courts consider "is whether the expert advisor truly offers independent and impartial advice." <u>Gregg v. Transp. Workers of America Int'l</u>, 343 F.3d 833, 841 (6th Cir. 2003); <u>see</u> <u>also</u> <u>Donovan v. Bierwirth</u>, 680 F.2d 263, 271 (2d Cir. 1982) (requiring a "careful and <u>impartial</u> investigation") (emphasis added).

The record here raises questions regarding Empire's independence and First Bankers's investigation into Empire's independence.  According to Ippensen's declaration, Empire's performance of both preliminary valuation work for the Rembar ESOP formation committee and "independent" valuation work for the ESOP trustee, was consistent with customary practice in the ESOP industry.  (Schnapp Decl. Ex. 5 ¶ 18).  But it is not clear that this statement takes into account the fact that Firor participated in the formation committee's activities and received Empire's preliminary valuation.

In his deposition, Ippensen testified that the experience Empire had with Rembar was one of the reasons First Bankers retained Empire as its financial consultant, and that he understood Empire "would have shared [its preliminary valuation] with a Rembar Formation Committee." (Sullivan Decl. Ex. Y, 49:16-22).  But Ippensen also testified he was not aware whether or not Empire's preliminary valuation had been shared with the selling shareholders or their agents. Moreover, he testified that had he known Empire's preliminary valuation had been shared with the selling shareholders, that would "raise . . . issues for First Bankers in deciding whether to be trustee."  (<u>Id</u>. at 50:10-28).  Furthermore, Serbin testified that had First Bankers known Empire had done preliminary valuation work for the Rembar formation committee, and, in particular, that Firor was on the formation committee and was privy to Empire's preliminary valuation

23

work, that would have impacted whether First Bankers would have hired Empire to prepare the final valuation.  (Sullivan Decl. Ex. Z, at 55:6-57:11).

Next, the Secretary argues a prudent inquiry into Empire and the preliminary work it did for the Rembar formation committee would have revealed that Empire's final valuation was almost exactly the same as its preliminary valuation, and that Empire's valuation conclusion was not based entirely on Empire's view of Rembar's financials, but instead was the result of negotiations with CSG.

The record supports the Secretary's contention that CSG and Empire negotiated the value of Rembar's stock before Empire issued its preliminary valuation.[9]  And the record establishes that Firor—the chairman of the board of directors, CEO, president, and majority shareholder of Rembar prior to the ESOP transaction—received Empire's preliminary valuation on or around March 11, 2005.  Moreover, Alex Meshechok of CSG explained to Firor by email that:

> The valuation is preliminary but in our experience there is no difference between the preliminary and the final valuation unless the business' performance changes materially.  The final valuation typically just affirms the preliminary value and is provided, along with a fairness opinion solely to the Independent Trustee within a week or two of the transaction closing.

(Sullivan Decl. Ex. M).  Firor replied to Meshechok:

> Walter has the [preliminary valuation].  He was going to make a copy for me, but I would rather get a copy directly and electronically as was promised.  We figured that Walter was some sort of key for the formation of the ESOP, but he was never told that he had an official capacity.  That choice is fine with everyone.

---

[9]     For instance, Griswold, a managing director at Empire, testified that Empire initially proposed a valuation "in the high 13 millions, and [CSG] said 20 million."  (Sullivan Decl. Ex. I, 93:2-16).  CSG urged Empire to increase its preliminary valuation conclusion, and specifically negotiated to persuade Empire to adjust valuation factors such as the discount rate.  (See Sullivan Decl. Ex. H, at 110:3-111:8; Ex. I, at 93:2-96:19).  Empire and CSG ultimately agreed to a valuation of $15.5 million, after Empire communicated to CSG, "We're not going any higher."  (Id. Ex. I, at 96:18-19).

Stan [Bulua] called to explain why the valuation is preliminary also.  I know [sic] understand.  I was concerned, as that number [$15.5 million] is the make or break decision to move forward.  I am comfortable that the number should stand.

Id.

Furthermore, First Bankers's appointment as the Rembar ESOP's trustee was expressly contingent on engaging Empire as First Bankers's financial advisor, which casts further doubt on Empire's independence and First Bankers's "care and impartial investigation" into Empire.  See Donovan v. Bierwirth, 680 F.2d at 271.

Additionally, the notes from the June 13, 2005, EB committee meeting indicate only one question was asked regarding Empire's valuation:  "Ippensen asked [Eckl] if he knew how Rembar had previously come up with their number.  [Eckl] said he did not know.  He pointed out that Empire ha[d] been engaged by the company and will be working for the Trustees."  (Sullivan Decl., Ex. C).  The record does not contain any contemporaneous evidence demonstrating that any follow up questions were asked, or that First Bankers undertook any further investigation into how the preliminary valuation number was derived.

As a whole, this record raises doubts—and questions of fact—regarding Empire's independence as a financial advisor and valuation consultant for First Bankers in connection with the 2005 transaction, and regarding First Bankers's inquiry into Empire's independence.

B.    First Bankers's Failure to Negotiate

The Secretary also argues it is entitled to summary judgment because First Bankers breached its fiduciary duties by not negotiating the purchase price the ESOP paid for Rembar's stock.

First Bankers, on the other hand, contends it negotiated the stock price, ESOP note terms, flow of funds, the seller finance notes, the limitation agreement, and the plan and trust

documents, in connection with the 2005 transaction.  However, the evidence First Bankers relies on in support of this contention is less than clear.

Initially, Ippensen testified "the list [of what First Bankers negotiated] would have been price, obviously the price of the stock.  It would have been ESOP note terms, which would have been length of the notes and the interest rate on that note.  The flow of funds . . . [, t]he seller finance notes, would have been part of that negotiation process.  The Limitation Agreement was part of that negotiation process.  The plan and trust document would have been a part of that negotiation process.  That's the only ones that I can think of." (Schnapp Decl. Ex. 24, at 123:1-14).

Ippensen later testified, however, that the stock purchase price was effectively not negotiated—the sellers made an offer to the buyers, and the ESOP never made a counteroffer. (Sullivan Decl. Ex. Y, at 205:5-15).  Serbin testified that she did not recall the price negotiations for the 2005 transaction, but that First Bankers typically negotiates ESOP transactions through its counsel.  (Id. Ex. Z, at 59:11-60:18).  Snarr—First Bankers's counsel—testified, "We really aren't the ones who do the price negotiations.  We negotiate the terms, but the price is sort of something that we are -- for us is a given, because that's what the trustee and its committee and its financial advisor really do."  (Id. Ex. N, at 33:3-8).  Bulua—Rembar and the selling shareholders' counsel—testified that he "was not involved in price negotiations" and did not remember any occurring.  (Id. Ex. S, at 94:9-13).

First Bankers maintains it did in fact negotiate the price of Rembar's stock, highlighting the fact that Empire ultimately valued 100% of Rembar's stock at $16 million, while the transaction closed at $15.5 million.  Moreover, First Bankers emphasizes that Griswold, a

managing director at Empire, testified that prior to closing, CSG called Empire seeking to persuade Empire to increase its valuation to $18.5 million.[10]

Courts have relied on the failure to negotiate the purchase price to support a finding that the fiduciary did not act in good faith on behalf of the ESOP. See Chao v. Hall Holding, 285 F.3d at 437 (ESOP fiduciary's lack of good faith demonstrated by, among other things, the fact that there was "no negotiation as to the price of the [employer's] stock"); Howard v. Shay, 100 F.3d at 1489 (faulting the fiduciaries for failing to test a valuation without empirical support by getting a second valuation and/or "complet[ing] the transaction without negotiation"); Horn v. McQueen, 215 F.Supp.2d 867, 881 (W.D. Ky. 2002) (fiduciary breached duty of good faith when it did not know how the purchase price was set and "price paid by the ESOP for the . . . shares was not reached through negotiations"). This Court, however, is not aware of any decision in which a court relied solely on a fiduciary's failure to negotiate the purchase price to

---

[10]   "Corporate Solutions had called Empire and said, again – and implied that they wanted – they were willing to drop to 18,5, and they said our number was not capturing full control.  We said, 'The number is 15,5.  The closing is in – in a week or so.  We're not changing our number.'"  (Schnapp Decl. Ex. 31, at 114:8-15).  The Secretary points out Griswold also testified that this number was a result of negotiation prior to Empire issuing its preliminary valuation and prior to Empire's retention by First Bankers:

> [B]efore the 15 -- before the conclusion was reached in the preliminary draft, there were discussions between Empire and CSG.  Negotiations.  I believe that we had verbally stated something in the high 13 millions, and they said 20 million . . . .  They impressed upon the offer of 11-1/2 million plus cash was 15 million and a half plus, and that was a -- and we said, "Provide us the data," and they said they couldn't provide us that information.  So, we negotiated back, and we . . . determined that we would go to 15,5 and . . . presented that is our number. . . . and a later date they came back, and they said, "Okay.  We're going to go forward. . . . We are engaging First Bankers Trust, please send them an engagement letter," as we stipulated in our preliminary engagement letter; that if they decide to move forward, we would reaffirm with the trustees, and we did that.

(Sullivan Opp'n Decl. Ex. I, at 93:9-95:17).

conclude that the fiduciary acted in bad faith.  See Perez v. First Bankers Trust Servs., Inc., 2016 WL 5475997, at *12 (S.D.N.Y. Sept. 28, 2016).  Instead, courts consider the failure to negotiate in light of all of the fiduciary's other conduct and the circumstances specific to the particular transaction at issue.  Id.

While it appears from the record that First Bankers engaged in less-than-vigorous negotiations on behalf of the ESOP, that factor alone is insufficient to find, as a matter of law, that First Bankers did not act in good faith.  Moreover, the extent to which First Bankers negotiated the 2005 transaction generally and the stock purchase price specifically, is a question of fact that has not been established by either party.

      C.     The Limitation Agreement's Voting Covenant

The Secretary also argues the Rembar ESOP paid more than fair market value for the Rembar stock because it paid a control premium despite agreeing to forfeit the ESOP's control of the Rembar board by entering into the voting covenant contained in Section 3.2(d) of the limitation agreement.

           1.     Whether First Bankers Was Aware of and Understood the Voting Covenant

On May 18, 2005, Snarr emailed Bulua and others at Rembar, CSG, and First Bankers, a draft of the limitation agreement, which contained the Section 3.2(d) voting covenant.  (Sullivan Decl. Ex. Q, at 6).  Snarr explained to First Bankers that the reason for the voting covenant was because Firor "did not want to go forward with the transaction absent the ability to have effective control of the board while his notes were outstanding."  (Id. Ex. N, at 88:2-7).

Bulua testified that he considered the voting covenant "belt and suspenders because in an ESOP transaction the owner of the company or the Board usually directs the ESOP as to who to

vote for on the Board anyway." (Schnapp Decl. Ex. 29, at 82:19-83:1).  The Secretary, however, disputes that Section 3.2(d) provided Firor with rights that he would have had anyway in the absence of this provision, and First Bankers points to no other evidence that corroborates Bulua's testimony.  Ippensen, for example, testified that the Rembar board could not direct First Bankers as to how to vote the shares held by the ESOP.  (Sullivan Opp'n Decl. Ex. Y, at 148:4-7).  Moreover, Griswold testified that he had not seen a provision like the Section 3.2(d) covenant in any ESOP transaction prior or subsequent to the Rembar transaction.  (Schnapp Decl. Ex. 31, at 146:3-11).

The parties also dispute the extent to which First Bankers negotiated the terms of the limitation agreement.  First Bankers relies on Ippensen's testimony regarding how First Bankers would have negotiated the limitation agreement based on its customary practices; however the record has limited evidence regarding what negotiations actually took place.[11]  Similarly, Serbin testified that she and Ash "would have reviewed [the limitation agreement] before we would have been comfortable signing it.  And we would want to make sure that our legal counsel had also reviewed the document."  (Sullivan Opp'n Decl. Ex. Z, at 82:16-12) (emphasis added).

Ash is the EB committee member who signed the limitation agreement on behalf of First Bankers as the ESOP's trustee.  In her deposition, Ash testified that she would have read the

---

[11]     See Schnapp Decl. Ex. 24, at 135:22-136:18 (The EB "committee would have been presented with the Limitation Agreement, understanding the terms that are in it.  And if there were terms we didn't like or something that we wanted changed, we would have charged that responsibility back to Kim and Merri to work with Brian Snarr on behalf of First Bankers, to go back to the company's counsel and if the selling shareholders had counsel, to work on the terms and the pieces that are in there.") (emphasis added).

limitation agreement "[p]robably once or twice" around the time she signed it.  (Sullivan Decl. Ex. P, at 142:1-7, 18-22, 144:1-8).

In the context of discussing a proposed non-compete covenant agreed to by Firor, an email from Bulua to Snarr dated June 8, 2015, frames Snarr's position that "since Frank [Firor] would be in control of Rembar he should not get out of the covenant [not to compete] if he has control over whether he is being paid on his note."  (Sullivan Decl. Ex. T).  Snarr responded to Bulua's email on June 9, 2015, copying Ash and Serbin of First Bankers, and further explaining his position regarding Firor's non-compete agreement.  Thus, arguably, Ash and Serbin were on notice that Snarr believed Firor would continue to effectively control Rembar following the consummation of the 2005 transaction.

Snarr testified that if First Bankers concluded that appointing Firor's director choices would violate ERISA, "the trustee always had the ability to choose to breach the agreement and honor its obligations under ERISA . . . if it thought that was the more prudent decision." (Sullivan Decl. Ex. N, at 88:8-18).  Bulua, on the other hand, testified that Section 3.2(d) required that the trust vote a certain way.  (Id. Ex. S, at 80:22-81:3).  He also testified that "Frank would generally have the ability to determine who a majority of the members of the Board of Directors would be, subject to the trustee's ERISA override."  (Id. at 81:16-19).

But Snarr and Bulua's opinion that First Bankers could breach the limitation agreement rather than vote for candidates they felt were imprudent is inconsistent with Ippensen and Ash's position that the provision did not require them to vote for Firor's candidates in the first place.

Moreover, even if First Bankers could choose to breach the voting covenant rather than vote for imprudent board members, the Secretary disputes that this is relevant to its claim that

30

Section 3.2(d) is a limitation on the ESOP's control of the company and thus should have impacted the control premium paid by the ESOP.  The Secretary also disputes that members of First Bankers's EB committee discussed the individuals' interpretations of what Section 3.2(d) required them to do prior to approving the 2005 transaction.  Specifically, the Secretary disputes that First Bankers ever contemporaneously discussed, amongst the EB committee members or with counsel, whether the limitation agreement permitted First Bankers to retain the ability to accept or remove the directors nominated by Firor.  According to the Secretary, this view of the limitation agreement is not reflected in any contemporaneous documents, including the notes from the June 13, 2005, EB committee meeting during which First Bankers approved the transaction.  Serbin testified she does not recall seeking legal advice with respect to the meaning of Section 3.2(d).  (Sullivan Decl. Ex. Z, at 94:20-95:2).  Ippensen also testified he does not recall whether the EB committee discussed his asserted understanding of the limitation agreement with regard to voting for board members.[12]

> ### 2.    Whether Empire's Valuation Takes the Voting Covenant into Account

Moreover, Empire's final valuation does not specifically mention Section 3.2(d) of the limitation agreement or explain whether the voting covenant it contains was factored into Empire's analysis.

---

[12]    Ippensen testified:  "It was like a nomination process to me. . . . I don't know if it was in my mind and it went out my lips or if we had a conversation . . . I know there was a conversation about that part of the agreement for putting the majority on there.  And again, I know that we had a conversation about it was a non-issue.  I mean we saw it as a non-issue.  So again, I don't know how much was said, I just remember in my own mind reconciling that it was a non-issue." (Sullivan Decl. Ex. Y, at 238:1-17).

Section G of the final valuation under the heading, "Issues of Control:  Enterprise Value"

states:

> Since a 100% equity interest, on an enterprise basis, is being valued, application of
> a premium to the derived freely tradeable value must be considered so as to
> recognize the prerogatives of control.  Publicly traded stocks are by definition freely
> tradeable minority interests.   Thus, when a bidder seeks control of a public
> company, a premium over its stocks' market pricing is usually paid.  This is because
> certain prerogatives, or levels of control, are transferred with percentages of
> ownership above 50%, such as the authority to:
>   - Determine management compensation and perquisites;
>   - Declare and pay dividends;
>   - Sell or acquire assets and/or liabilities;
>   - Change the articles of incorporation or by-laws; and
>   - Liquidate, dissolve, sell, or recapitalize the company.
>
> . . . .
>
> In this case, the benefits of a control position in Rembar are more limited than the
> public company transactions in the above studies, especially given that no
> immediate efficiencies or synergies are clearly evident for a potential acquirer of
> the Company, particularly in the case of the ESOP as owner.  As a result, a
> control premium at the lower end of the range was deemed appropriate and 25%
> was selected.

(Sullivan Decl. Ex. L at 46–47).

First Bankers contends the voting covenant was in fact considered by Empire, pointing to

Ippensen's testimony that, "We talked about the control premium that they put on to the value

and what was in the Limitation Agreement."  (Schnapp Decl. Ex. 24, at 67:17-19).  Ippensen

further testified that Empire incorporated the effect of [the voting covenant] into its valuation as

part of the control premium."  (Id. Ex. 24, at 158:5-9).  First Bankers also relies on Eckl's

testimony that the voting covenant was factored into Empire's valuation conclusion.  (Id. Ex. 30,

176:9-14).

The Secretary, on the other hand, maintains that Empire and First Bankers did not

consider the effect of the voting covenant on the valuation, and that Empire did not advise First

Bankers as to the effect of the covenant on the valuation.  The Secretary emphasizes that the percentage control premium applied by Empire did not change between its preliminary and final valuations, even though the limitation agreement had not yet been contemplated at the time of the preliminary valuation.  Furthermore, Ippensen further testified that the control premium "matched our understanding of buying 100 percent of the company . . . the question becomes why would there be a control premium applied?  Pretty simple, we bought 100 percent of the company in the Rembar transaction."  (Sullivan Opp'n Decl. Ex. Y, at 117:8-16, 120:18-21).

The Secretary's position is that the voting covenant limited the control the ESOP actually had over Rembar.  In that regard, Eckl testified that he believed the ESOP's ability to challenge the voting covenant was "a legal question more than a valuation question."  (Sullivan Opp'n Decl. Ex. V2, at 180:8-16).  Eckl further testified that Firor's ability to name the majority of the Board "was a short-term thing."  (Id. Ex. V2, 203:18-22).

The report of Bradley Van Horn, First Bankers's expert, states:  "One of the effects of the Limitation Agreement is that full control over the Company's Board of Directors will not pass to the Trustee until the Seller Subordinated Note is paid in full, which is expected to occur several years subsequent to the transaction date."  (Sullivan Decl. Ex. X at 55).  Accordingly, Van Horn concludes that for his own valuation of Rembar:

> A control premium of 15% was selected . . . consistent with the lower end of the range of market data presented above.  The selection of a premium from the lower end of the range of market data is designed to take into account the economic restrictions associated with the Limitation Agreement.

(Sullivan Decl. Ex. X, at 55).  James Krillenberger, the Secretary's valuation expert, applied a control premium of 12.5% to the value of Rembar's stock.  (Id. Ex. W).  Krillenberger opines that a 50% reduction of Empire's calculated control premium was appropriate because the ESOP

"may have received some element of control but not voting control or control in fact."  (Id. at 13-14).

On this record, the Court concludes the Secretary has raised a triable question of fact regarding whether First Bankers acted prudently in understanding the limitation agreement and voting covenant, and whether it properly ensured the control premium paid by the ESOP was fair.

D.    Empire's Discount Rate Calculations

The Secretary also argues First Bankers breached its fiduciary duties by accepting the flawed discount rate Empire applied in determining Rembar's value.

In preparing its final valuation of Rembar, Empire utilized and evenly weighted two valuation methodologies:  (i) the debt-free discounted cash flow method ("DCF"); and (ii) the capitalization of debt-free cash flow method.  Empire's DCF analysis used forecasts of Rembar's future cash flows together with a required rate of return by which to discount the projected cash flows back to their present value.  In order to estimate the required rate of return, Empire calculated Rembar's weighted average cost of capital ("WACC").  The development of the WACC requires Rembar's cost of debt and cost of equity to be determined separately.  As explained by First Bankers's expert Van Horn, "the discount rate is a measure of the riskiness of a company, so the higher the discount rate, the lower the valuation conclusion, and the lower the discount rate, the higher the valuation conclusion."  (Sullivan Decl. Ex. CC, 64:5-9).  The discount rate Empire used in both its preliminary and final valuations, relied on an assumed capital structure of 50% equity and 50% debt.  Empire's final valuation report explains that this assumed capital structure "takes into account Rembar's lack of debt historically, expected future

34

debt levels that in the short term will be uncharacteristically high, and the asset base which can be leveraged against." (Sullivan Decl. Ex. L, at 39).

Krillenberger, the Secretary's expert, opined that Empire's valuation conclusion was:

fundamentally flawed in that the calculated discount rate relied on a capital structure that did not reflect the normalized capital structure of Rembar. A normalized capital structure should consider the subject company's historical capital structure, long term expected capital structure, and the capital structure of comparable companies in the subject company's industry.
. . . .
Empire's assumption of a capital structure of 50% debt and 50% equity had a significant effect on lowering the discount rate and over-valuing Rembar.

(Sullivan Decl. Ex. W, at 14-15). Krillenberger concluded that a capital structure of 75% equity and 25% debt represented the appropriate normalized capital structure for Rembar, "[b]ased on Rembar's lack of debt historically, the expectation that Rembar's uncharacteristically high debt levels after the Rembar ESOP transaction [would] not represent a long term capital structure, and with consideration of the comparable companies in Rembar's industry." (Id.). According to Krillenberger, if the capital structure relied on in Empire's analysis was adjusted to 75% equity and 25% debt, Empire's valuation conclusion would decrease by $3.9 million. (Id.).

First Bankers's valuation expert also opined that a capital structure of 75% equity and 25% debt was the appropriate ratio to calculate Rembar's WACC, but reached a different overall valuation conclusion that the Secretary's expert. (Sullivan Decl. Ex. CC, at 64:12-65:12).

Whether the discount rate Empire applied in its valuation was reasonable is a disputed question of fact. Additionally, whether First Bankers's reliance on Empire's assumptions and calculations satisfied its fiduciary duties, is also a question of fact. Accordingly, summary judgment is not warranted.

V.    Economic Loss

Lastly, First Bankers argues it is entitled to summary judgment because even if it breached its fiduciary duties when it authorized the 2005 transaction, the Secretary has failed to establish that the ESOP suffered an actual economic loss.

The Court disagrees.

First, in making its economic loss argument, First Bankers misconstrues the Henry v. Champlain Enterprises line of cases it relies on.  Because the Henry v. Champlain Enterprises cases address many of the same issues that arise here, the Henry cases warrant discussion in some detail.

The first Second Circuit decision in Henry arose from an appeal following a bench trial on ERISA §§ 404 and 406 claims brought by ESOP participants against plan fiduciaries.  Henry v. Champlain Enters., 445 F.3d 610 (2d Cir. 2006).  The defendants had approved the March 15, 1994, purchase by the ESOP of approximately 30% of the shares of CommutAir, the ESOP's sponsoring company.  The ESOP paid a total of $60 million for 540,000 shares of convertible preferred CommutAir stock, financed by a $9 million loan from CommutAir and three promissory notes totaling $51 million issued by the ESOP to the selling shareholders.  Id. at 617.  The district court had found defendants liable for failing to investigate the terms of the challenged transaction in good faith, and thus that the transaction was prohibited under Section 406.  Id. at 616-17.  The district court awarded damages of $7.75 million—the amount by which the district court found the ESOP overpaid for the CommutAir stock—plus approximately $7.5 million prejudgment interest, for a total award of $15.5 million.  Id. at 621-23.

36

On appeal, the fiduciary argued the district court's award of damages and prejudgment

interest "greatly exceed[ed] the ESOP's actual economic loss and thereby result[ed] in a

windfall."  Henry v. Champlain, 445 F.3d at 623.  First, appellants argued the district court erred

in using the figure the ESOP actually paid in the challenged transaction—$60 million—in its

damages calculation, because the parties had jointly stipulated that as of January 2001, the ESOP

had paid only $54,519,801 million in principal for the shares it received in the transaction and,

thus, the ESOP's actual economic loss of principal was at most $2.27 million.[13]  Id. at 624.

Second, appellants argued that to the extent the ESOP suffered any economic loss, the

ESOP may have already been fully compensated because the stock purchase agreement between

the sellers and the ESOP provided that if the Internal Revenue Service, Department of Labor, or

a court made a final determination that the ESOP paid more than fair market value for the

purchased CommutAir shares, the sellers must pay the ESOP an amount equal to the difference

between the purchase price and the fair market value of the shares, plus reasonable interest.

Under this agreement, the sellers were permitted to satisfy the difference in cash or in the form of

additional shares.  In February 2004, after the district court found that the IRS had made a final

determination that the ESOP had overpaid for its CommutAir stock, the sellers executed the

stock purchase agreement remedy and agreed to provide the ESOP the additional CommutAir

shares it was entitled to as of March 15, 1994.  The fiduciary argued that even if the ESOP did

overpay for the CommutAir stock, the remedial payment of additional shares restored the ESOP

---

[13]     In 1999, CommutAir settled a dispute with the Internal Revenue Service over
CommutAir's deductions for its contributions to the ESOP.  The settlement was based on an
assumption—for purposes of that settlement—that the fair market value of the purchased stock,
at the time of purchase, was only $51 million rather than $60 million.  Henry v. Champlain
Enters., 445 F.3d at 617.

to the position it would have occupied absent any overpayment, and thus constituted a complete remedy.  As such, any further recovery would amount to a prohibited windfall.  Id. at 624.

Because "[t]he aim of ERISA is 'to make the plaintiffs whole, but not to give them a windfall,'" the Second Circuit remanded the case to the district court to determine whether plaintiff-appellees were entitled to recover damages and, if so, to explain why those damages did not result in a windfall to the ESOP.  Henry v. Champlain Enters., 445 F.3d at 624 (quoting Jones v. Unum Life Ins. Co. of America, 223 F.3d 130, 139 (2d Cir. 2000)).

Meanwhile, in February 2006 during the pendency of the first Henry appeal, the ESOP sold all of its CommutAir shares to CommutAir in exchange for CommutAir's cancellation of the outstanding $9 million promissory note and CommutAir's owners' cancellation of the outstanding balance on the $51 million in promissory notes.  Henry v. U.S. Trust Co. of California, N.A., 569 F.3d 96, 98 (2d Cir. 2009).  The 2006 sale and debt-forgiveness transaction did not purport to be a settlement of any claims against the ESOP's fiduciaries for liability under ERISA.  Id. at 98.

Following the 2006 remand from the Second Circuit, the district court found that even if ERISA violations occurred, the plaintiff beneficiaries suffered no damages.  Henry v. Champlain Enters., 468 F. Supp. 2d 368, 373 (N.D.N.Y. 2007).  The district court addressed the windfall issue, but not with reference to the 2004 remedial transfer of additional shares to the ESOP. Instead, the district court reasoned that because the February 2006 sale of the ESOP's CommutAir shares to CommutAir involved the cancellation of approximately $14.5 million of the ESOP's debt (based on $9 million owed to CommutAir and approximately $5.5 million owed to CommutAir's other shareholders), the ESOP ultimately paid only $45.5 million for its

CommutAir shares.  The district court reached that figure by subtracting the $14.5 million in

loans forgiven in the 2006 transaction from the $60 million purchase price in the 1994

transaction.  The district court then concluded that because $45.5 million was less than $51

million (the stipulated value of the CommutAir shares purchased at the time of the 1994

transaction), "any award of damages would constitute a windfall."  Henry v. U.S. Trust Co., 569

F.3d at 99 (quoting Henry v. Champlain Enters., 468 F. Supp. 2d at 372).

> The Second Circuit overturned the district court's conclusion, explaining:
>
> [W]hen the ESOP purchased CommutAir shares in 1994 for $60 million, financed
> by incurring debt, and then in 2006 sold those shares (plus additional shares
> received in 2004) in exchange for forgiveness of $14.5 million in debt, the result
> was not a decrease in the price paid in 1994, but rather the realization of a
> substantial loss on that investment.
> . . .
> [The question of] whether an award of damages against [the ESOP trustee] would
> result in an impermissible windfall still remains impossible for us to determine.
> Whether or not the ESOP ultimately was overcharged depends not only on the
> purchased shares' price, but also on their value.  How much the total number of
> shares that the ESOP acquired in 1994 and 2004 was worth at the time of the 1994
> transaction is a question of fact that the record before us does not answer.

Henry v. U.S. Trust Co., 569 F.3d at 100 (emphasis added).  Accordingly, the Second Circuit

remanded the case again to the district court.

 Here, First Bankers argues that the 2009 "forgiveness" of the debt incurred by Rembar

and the ESOP in connection with the 2005 transaction should be construed as a downward

adjustment to the purchase price paid by the ESOP for the Rembar stock.  Specifically, First

Bankers claims "[t]he $6.5 million forgiveness of the Seller Notes resulted in a purchase price of

$9 million, which is $1.5 million less than the $10.5 million fair market value claimed by the

Secretary."  (Def.'s Br. at 35).  Thus, even if the $15.5 million purchase price in 2005 was an

overpayment, the Rembar ESOP was made whole by the 2009 debt "forgiveness."

First Bankers is plainly wrong.

It is undisputed that in 2005, the Rembar ESOP purchased 100% of Rembar's stock (100,000 shares) for a total purchase price of $15.5 million (representing $155 per share). The ESOP's purchase was financed by a loan for $15.5 million from Rembar. Rembar, in turn, financed $11.5 million of that amount, including $6.5 million from the selling shareholders in exchange for subordinated notes. However, the ESOP was not a party to any of the debt Rembar incurred in connection with the 2005 transaction. Accordingly, the 2009 forgiveness of the subordinated seller notes had no impact whatsoever on the price the ESOP paid for Rembar's stock in 2005.

Furthermore, according to the Secretary, following the 2005 transaction, part of the ESOP's employee beneficiaries' compensation was retirement contributions Rembar made to the ESOP. (Pl.'s Br. at 22). The ESOP used these contributions to repay the $15.5 million loan (and its attendant interest) to Rembar. Each time the ESOP paid off some of the money it had borrowed from Rembar, it released shares in individual employee beneficiaries' retirement accounts. By 2009, the ESOP had made four years of payments on its $15.5 million loan in exchange for the allocation of approximately 15% of Rembar's shares.

At the time of Rembar's 2009 restructuring, Rembar, the ESOP, and Firor entered into a stock redemption agreement. According to that agreement, as of July 30, 2009, the ESOP owned 100,000 shares of Rembar's common stock, of which 15,384.615 shares were allocated to the accounts of the ESOP's participants, and $13,834,474.26 of the loan from Rembar to the ESOP remained outstanding. Pursuant to the stock redemption agreement, Rembar purchased the allocated shares for $15,500 (representing $1.0075 per share), the ESOP surrendered the

unallocated shares, and Rembar cancelled the then-outstanding balance of the loan from Rembar
to the ESOP.

Citing the 2009 stock redemption agreement, First Bankers baldly asserts "[t]he 2009
agreement to forgive the entire amount of indebtedness did not include or involve any sale of
Rembar's stock." (Def.'s Opp'n Br. at 17). But the stock redemption agreement itself, and a
copy of a draft 2009 fairness opinion prepared by Empire, both expressly characterize the
transaction as a "sale."[14] And although First Bankers characterizes the cancellation of the loan
from Rembar to the ESOP as debt "forgiveness," the Secretary is correct that this transaction
may be more accurately characterized as a purchase of Rembar's unallocated stock from the
ESOP for the amount of the loan "forgiven." The Second Circuit's 2009 opinion in Henry is
instructive here:

> The district court assumed that when a purchaser of stock incurs debt to finance the
> purchase and then later sells the stock in exchange for cancellation of some of that
> debt, the debt cancellation in the second transaction should, for purposes of ERISA,
> be construed as having reduced, post facto, the purchase price in the first
> transaction, and thus to have reduced any loss for which damages should be
> awarded. We disagree.
> . . .

---

[14]       For example, under the heading "Purchase and Sale of the Shares," Section 1(a) provides
that "on the Closing Date . . . [the ESOP] will sell and transfer to [Rembar], and [Rembar] will
redeem from the [ESOP], the Allocated Shares." (Schnapp Decl. Ex 16, at 2 (emphasis added)).
Section 4(g) contains a representation and warranty by the ESOP that "[t]he sale of the Allocated
Shares and the surrender of the Unallocated Shares to [Rembar] hereunder complies with all
applicable federal and state securities law." (Id. at 5 (emphasis added)). Section 13 provides
that "[t]he Allocated Shares purchased hereunder" are subject to a claw-back provision. (Id. at
11 (emphasis added)). The draft fairness opinion refers multiple times to the $15,500 "purchase
price." (See Sullivan Opp'n Decl. Ex. EE at 3 (emphasis added)). Moreover, regardless of how
the 2009 transaction documents characterize the transfer of Rembar's shares from the ESOP to
Rembar, it is axiomatic that when a court interprets a written contract, "[f]orm should not prevail
over substance." Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co., N.A., 773
F.3d 110, 119 (2d Cir. 2014) (quoting Kass v. Kass, 91 N.Y.2d 554, 566 (N.Y. 1998)).

> If an investor pays $100 for 20 shares of stock and later sells those shares back to the original seller for $25, the result is not that the investor paid only $75 for the shares.  Rather, the result is that the investor lost $75 on that investment.
>
> Although the transactions in the present case involved payment chiefly in the form of debt obligations and debt forgiveness, rather than cash, the fundamental logic remains the same. . . .  [W]hen the ESOP purchased CommutAir shares in 1994 for $60 million, financed by incurring debt, and then in 2006 sold those shares (plus additional shares received in 2004) in exchange for forgiveness of $14.5 million in debt, the result was not a decrease in the price paid in 1994, but rather the realization of a substantial loss on that investment.

Henry v. U.S. Trust Co. of California, 569 F.3d at 99–100.

Here too, when the Rembar ESOP purchased Rembar shares in 2005 for $15.5 million, financed by incurring debt, and then in 2009 sold those shares in exchange for $15,500 plus forgiveness of $13,834,474.26 in debt, "the result was not a decrease in the price paid in [2005], but rather the realization of a substantial loss on that investment."  See id. at 100.

First Bankers has not established that a post facto adjustment of the $15.5 million purchase price paid by the Rembar ESOP in 2005, to a price that is below the $10.5 million the Secretary claims the Rembar stock was actually worth at the time, is warranted.  There is no indication, for example, that subsequent to the 2005 transaction, Rembar or the selling shareholders executed a remedy akin to the 2004 transfer of additional shares, as CommutAir's owners did in Henry.  See Henry v. Champlain Enters., 445 F.3d at 624.  Moreover, no documents in the record suggest the 2009 stock sale and debt forgiveness transaction purported to be a settlement of any claims against the ESOP's fiduciaries for liability under ERISA.  See Henry v. U.S. Trust Co. of California, N.A., 569 F.3d at 98.

Furthermore, First Bankers's argument that the Rembar ESOP did not actually suffer an economic loss, does not account for the fact that the assumption of indebtedness itself may well have constituted a loss to the ESOP.  See Henry v. U.S. Trust Co. of California, 569 F.3d at n.4

42

("[T]he assumption of indebtedness has immediate legal and economic consequences. . . .  For example, the borrower's plans for the future are now constrained by the obligation to commit future income streams to repaying the loan, and the borrower's ability to obtain future loans at a low rate decreases, because the borrower is now a greater credit risk.").

Finally, the question of whether or not the Rembar ESOP ultimately was overcharged—and thus suffered an actual economic loss—"depends not only on the purchased shares' price, but also on their value."  See Henry v. U.S. Trust Co., 569 F.3d at 100.  The Secretary and its valuation expert claim the Rembar stock was actually worth $10.5 million at the time of the 2005 transaction, rather than the $15.5 million that was paid, which raises a triable question of fact. (See Sullivan Decl. Ex. W, at 2).

Because at this time and on this record, (i) the Court is unable to determine the fair market value of the shares the Rembar ESOP acquired pursuant to the 2005 transaction; and (ii) First Bankers has failed to establish, as a matter of law, that the $15.5 million price paid in 2005 should be adjusted downward based on subsequent events, First Bankers is not entitled to summary judgment on its economic loss argument.

43

**CONCLUSION**

First Bankers's motion for summary judgment is DENIED.

The Secretary's cross-motion for partial summary judgment is DENIED.

Counsel are directed to appear at a case management conference on May 10, 2017, at 2:30 p.m., at which time the Court expects to set a trial date.

By May 3, 2017, the parties shall submit a Joint Pretrial Order in accordance with the Court's Individual Practices.

The Clerk is instructed to terminate the motions.  (Docs. ##118, 134).

Dated: March 29, 2017
       White Plains, NY

SO ORDERED:

Vincent L. Briccetti
United States District Judge